**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| FIGURES TOY COMPANY, a Florida corporation, | |
| Plaintiff, | |
| v. | Civil Action No. _____ |
| WORLD WRESTLING ENTERTAINMENT, INC., a Delaware Corporation | JURY TRIAL DEMANDED |
| Defendant. | AUGUST 28, 2013 |

**COMPLAINT**

Plaintiff Figures Toy Company files this Complaint against Defendant World Wrestling Federation, Inc. seeking a declaratory judgment that the parties' Consumer Products License Agreement has not been terminated and that Plaintiff is not infringing Defendant's intellectual property rights by continuing to make, advertise and sell the products licensed under that agreement. Plaintiff also alleges that Defendant has breached the Agreement and tortuously interfered with Plaintiff's business.

**PARTIES**

1.      Plaintiff Figures Toy Company ("FTC" or "Plaintiff") is a Florida corporation with its principal place of business at 12826 Commodity Place, Tampa, Florida. FTC is a small designer and manufacturer of collectible toys and action figures. FTC has been a licensee of Defendant World Wrestling Entertainment, Inc. since 2000. The operative license agreement between FTC and the Defendant is known as the "Consumer Products License Agreement" ("the Agreement").

2.      Defendant World Wrestling Entertainment, Inc. ("WWE" or "Defendant") is a Delaware corporation with a principal place of business at 1241 E. Main Street, Stamford, Connecticut.  WWE is a signatory to the Agreement and the licensor of certain intellectual property identified therein.

## JURISDICTION AND VENUE

3.      Plaintiff alleges claims for declaratory relief under Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202.  This Court has diversity jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332, because Plaintiff is a citizen of Florida and Defendant is a citizen of Delaware and Connecticut and the amount in controversy exceeds $75,000, exclusive of costs.

4.      This Court has personal jurisdiction over Defendant based on its express consent in Section N(13) of the Agreement and because Defendant has its principal place of business in this District.

5.      Venue in this District is proper based on the parties' consent in Section N(13) of the Agreement.  Venue also is proper under 28 U.S.C. § 1391 because WWE is subject to personal jurisdiction in this District and has its principal place of business in this District.

## THE AGREEMENT

6.      FTC has been a licensee of WWE for over 12 years.  In 2000, FTC initiated the licensing relationship between the parties when it approached WWE with the idea of selling wrestling belts that replicated the belts worn by WWE superstars.  Based on the vision, hard work and skill of FTC, the replica belt quickly became the best-selling item in the WWE licensing program.  Over the years, the WWE has made millions of dollars from products

manufactured under the Agreement.  Over the years, the Agreement has grown so that today many dozens of different types of products are sold under the Agreement, thousands of deliveries are made and millions of dollars of licensed products are sold.

7.     The current licensing Agreement between the parties is attached as Exhibit 1.  The Agreement provides a license to FTC to manufacture, distribute, advertise, and sell, among other things, replica belts incorporating WWE's intellectual property (the "Licensed Products").  *See id.* at p. 4.  Under the Agreement, FTC has the exclusive right to manufacture, distribute, and sell the replica belts in the United States in all channels of trade except for those specifically reserved to the WWE.  *Id.* at pp. 2-3.

8.     In 2010, FTC and WWE signed the First Amendment to Consumer Product License Agreement ("First Amendment"), which required WWE to purchase certain replica belts exclusively from FTC for the term of the Agreement.  Exhibit 2.  In 2012, FTC and WWE signed the Second Amendment to Consumer Product License Agreement ("Second Amendment"), which extended the term of the Agreement until June 30, 2015.  Exhibit 3.

9.     The Agreement contains the following clause relating to termination:

¶ L(1)(a):  Immediate Right of Termination.  In addition to the termination rights stated elsewhere in this Agreement, WWE will have the right to terminate this Agreement immediately by giving written notice to Licensee, in any of the following situations: . . . (vii) [i]f Licensee exhibits a pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products to its customers or retailers that results: (1) in the inability of retailers to meet consumer demand and materially affects the generation of royalties payable to WWE, and/or (2) in an adverse effect to the WWE licensing program; provided, however, that this clause will not be applicable to a failure to make timely delivery that results from a force majeure event or an unexpected, unplanned demand, so long as all reasonable efforts are made by Licensee to resume timely delivery as soon as possible[.]

Exhibit 1 at p. 29.

**FACTS GIVING RISE TO PLAINTIFF'S CLAIMS** Earlier this year, Defendant hired a new Buyer, Ms. June Jack, who was placed in charge of licensing contracts including the Agreement between the parties.  On information and belief, Ms. Jack has previously worked for a well-known U.S. toy company and has experience working directly with Chinese toy manufacturers.

11.     During the spring and early summer, Ms. Jack and FTC communicated about Licensed Products delivered under the Agreement.  Ms. Jack was unhappy with the Second Amendment to the Agreement that had been reached a year earlier between FTC and WWE because she believed that the WWE could obtain the Licensed Products directly from a Chinese manufacturer at a lower price than WWE was paying FTC for the products.  Ms. Jack repeatedly expressed this sentiment in her dealings with FTC.

12.     On information and belief, in an effort to eliminate its long time business partner FTC and to steal the license back from FTC so that it could reap additional profits, Defendant devised pre-texts for terminating the Agreement and eliminating FTC from the equation.

13.     On August 8, 2013, with no prior warning of a possibility of termination, WWE sent an alleged termination notice ("Termination Notice") to FTC.  Exhibit 4.  The notice stated that WWE was immediately terminating the Agreement pursuant to Section L(1)(a) on account of an alleged "documented pattern of failures by [FTC] to make timely delivery of sufficient quantities of the Licensed Products [] at least since September 2012."  *Id.* at p. 1.  WWE further contends that these alleged failures have "had an adverse effect on the WWE licensing program." *Id.* at p. 3.

14.     The termination letter identifies several deliveries beginning with an order placed by WWE in September 2012 as grounds for the termination.  *See id.*  Despite the fact that

approximately 50 different products are manufactured under the Agreement, the termination letter identifies alleged problems with only 2 of the 50, i.e., the "spinner" belt and the championship belt.  None of the alleged deliveries are a proper ground for termination.

15.     **Spinner Belts.**  WWE contends that it placed orders for the "spinner" belt in September 2012 and November 2012, but that FTC did not timely deliver the belt.  *Id.* at p. 2.  There is no basis for this contention and it is a pre-text to attempt to terminate the Agreement.

16.     In 2012, WWE informed FTC that the spinner belts would no longer be shown on television beginning in August 2012, and were being replaced by another belt.  In the 12 previous years when WWE stopped showing a belt on television, sales of the belt dramatically declined.  Based on WWE's representation and FTC's 12 year experience, FTC allowed inventory on the spinner belt to be drawn down.

17.     In September 2012 – after the date the belt was no longer to be featured on television – and without any advanced warning, WWE placed a large order for the spinner belt to be sold at various venues throughout the United States.  Upon receiving the order, FTC informed WWE that it would be difficult to deliver the belts because WWE had told FTC that the belt would no longer be shown on television in August and FTC had therefore allowed the inventory to be drawn down on that item.  WWE responded that it understood the predicament in which it had placed FTC and told FTC to deliver the belts as soon as it could.

18.     FTC delivered 50 pieces of the belt in December 2012 and the remaining 50 pieces of the belt on January 3, 2013.

19.     On or about November 14, 2012, FTC alerted WWE to the fact that it had not placed an order for the Christmas 2012 season.   Later that day, and in response to FTC's reminder, WWE placed its 2012 Christmas Order, which consisted of many different licensed products, including an order for 100 pieces of the spinner belt.   Despite the fact that WWE's Christmas Order was over a month late, with the exception of the spinner belt, FTC shipped to the WWE every item that was ordered the same day.   With regard to the spinner belt, it again alerted WWE to the fact that WWE had told FTC that the spinner belt would be discontinued from television in August 2012 and that it would deliver the spinner belt as soon as possible.

20.     FTC fully delivered the November 2012 order for the spinner belt by December 17, 2012.   At its own expense, FTC arranged for these belts to be flown to WWE in mid-December 2012.

21.     WWE's September and November 2012 orders for the spinner belt were unexpected and unplanned and FTC repeatedly communicated that fact to WWE.   WWE never disputed the substance of those communications until its August 8, 2013 Termination Notice.

22.     FTC immediately used all reasonable efforts to have the spinner belts that WWE ordered in September and November 2012 delivered.   Under the circumstances, the deliveries were timely, as FTC made all reasonable efforts to deliver the spinner belts in response to an unexpected and unplanned demand, and made all reasonable efforts to resume timely delivery of the spinner belts – to the extent the delivery of the spinner belts was ever untimely – as soon as possible.   Indeed, WWE placed additional orders for the spinner belts this year beginning in early January 2013, and each of those orders were fulfilled immediately and without any claim that they were untimely

23.     FTC's deliveries of the spinner belts in response to WWE's September and November 2012 Orders did not have an adverse effect to the WWE licensing program.

24.     **Championship Belts**.  WWE also contends in its Termination Notice that FTC failed to make timely delivery of sufficient quantities of the championship belt, beginning in March 2013.  *See* Exhibit 4 at pp. 1-2.  There is no merit to that contention and it is not a proper basis on which to terminate the Agreement.

25.     In late January 2013, WWE placed its first orders for the championship belt.  The championship belt is a very intricate, handmade product consisting of over 100 jewels which must be hand-placed on each belt.  FTC delivered on those orders in a timely manner and WWE has never alleged otherwise.

26.     On or about February 26, 2013, with no advance warning, WWE placed orders for the new championship belt that were approximately 3 times greater (in excess of 1000 pieces) than the previous highest order that had been placed for a single belt.  At the time those orders were placed, FTC notified WWE that this type of unexpected, unplanned demand for the championship belt would place tremendous pressure on FTC's Chinese manufacturer, but that it would use its best efforts to deliver the products.  FTC delivered these products on or about March 21, 2013.  Because of the unprecedented magnitude of the order, which was both unplanned and unexpected, there were some quality issues with the belts that were delivered in March 2013.  FTC used its best efforts to acclimate to handling this unprecedented volume of orders for a handmade piece that required the placement by hand of more than 100 different jewels.

27.     On or about April 24, 2013, WWE placed another extremely large order for the championship belts, followed by smaller orders in June and July, 2013.  FTC once again used its best efforts to ensure the timely delivery of these belts.  In addition to the massive numbers of products that were ordered, FTC was also dealing with the production of a handmade product that required the placement by hand of over 100 different jewels.

28.     In May 2013, Ms. Jack determined that going forward, each of the championship belts would be examined for quality, which was an entirely new procedure.  Based on subjective determinations made by WWE staff – applying alleged standards of "defectiveness" never provided to FTC and never applied in the past – WWE rejected some of the belts that were delivered in May and June 2013.  Many of these rejections were not in good faith and were merely a pre-text to make a claim for termination.

29.     By August 2013, FTC had completely resolved any issues relating to WWE's unexpected, unplanned demand for the championship belt and, to the extent that the championship belts had previously been delivered in an untimely manner, FTC had resumed timely delivery.  FTC had resolved all quality issues, even under the new quality standards that were being applied by WWE for the first time in May and June 2012.

30.     On August 7, 2013, Mr. Steve Sandberg of FTC called Ms. June Jack of WWE to inquire about the championship belts that had been delivered earlier in August.  Ms. Jack informed Mr. Sandberg that 164 of the 165 belts were acceptable and that additional orders would be forthcoming.  At no point during that call did Ms. Jack mention any of the allegedly ongoing issues cited in the Termination Notice.

31.     On August 8, 2013, WWE purported to terminate the Agreement based on the above-identified deliveries of the spinner belts and the championship belts.  *See* Exhibit 4.  Prior to sending the Termination Notice, WWE never notified FTC that it was poised to terminate the Agreement, or made any mention of a termination.  Prior to sending the Termination Notice, WWE never notified FTC that it believed the events identified above were a "pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products."  *See* Exhibit 4 at p. 1, referencing Section L(1)a)vii) of the Agreement.  Nor did WWE make FTC aware that the delays, if any, "had an adverse effect on the WWE licensing program."  *See id.* at p. 3.  In fact, the alleged instances of breach by FTC identified in the Termination Letter did not have a negative effect on WWE's licensing program.  Moreover, to the extent that there was a "pattern of repeated failure to make timely delivery of sufficient quantities of Licensed Products," those failures resulted from an "unexpected, unplanned demand" for the product and FTC made "all reasonable efforts to resume timely delivery as soon as possible," as required under the Agreement.  Exhibit 1 at p. 29.

32.     In its August 8, 2013 Termination Notice, WWE relies upon Section L(1)a)vii) as the basis for the termination.  *See* Exhibit 4.  However, that Section has no application because it only gives rise to a termination, upon "a pattern of repeated failure [by FTC] to make timely delivery of sufficient quantities of Licensed Products **to its customers or retailers** . . ." (emphasis added).  Exhibit 1 at p. 29.  Because the only failures identified by WWE in its Termination Notice are with respect to deliveries made to WWE, and WWE is not a "customer or retailer," Section L(1)a)vii) has no application and is not a proper basis on which to terminate the Agreement.  FTC has not failed to make timely delivery of sufficient quantities of Licensed Products to any of its customers or retailers.

33.     In March 2013, WWE provided FTC with projections for substantial quantities of Licensed Products through the end of the year.  FTC has already commenced the expensive and labor-intensive process of manufacturing these products.

34.     In mid-July 2013, Ms. Jack placed additional orders for millions of dollars of Licensed Products.  FTC has already commenced the expensive and labor-intensive process of manufacturing these products.  Upon information and belief, Ms. Jack placed these orders knowing that WWE planned to wrongfully terminate FTC and then offer to purchase the products already in the process of being manufactured or shipped for a fraction of the agreed-upon prices.  By doing this, Ms. Jack ensured that WWE would have sufficient Licensed Products for the 4th quarter of 2013.

35.     If WWE is allowed to terminate the Agreement, FTC will be forced to let go of employees and suffer significant damages, as well as irreparable injury to its goodwill and reputation in the industry and to its customer base.

36.     After sending the Termination Notice, WWE began notifying FTC's customers that they could not advertise FTC's WWE products in their magazines.  FTC's customers have begun to remove FTC's advertisements from publications.

37.     Upon information and belief, an agent of WWE contacted FTC's manufacturer for the Licensed Products, in China, and an agent of WWE has met with FTC's Chinese manufacturer of the Licensed Products.  Upon information and belief, WWE intends to purchase the Licensed Products directly from FTC's manufacturer in violation of the Agreement.

<u>COUNT I</u>

**DECLARATORY JUDGMENT REGARDING NON-BREACH OF THE AGREEMENT**

38.      FTC repeats and realleges the allegations in the foregoing paragraphs as though fully set forth herein.

39.      An actual controversy has arisen and now exists concerning the termination of the Agreement.  WWE has purported to terminate the Agreement, and asserts that FTC may not continue to manufacture or sell the Licensed Products.  FTC contends that the purported termination is ineffective because no grounds for termination exist under the Agreement, and that WWE is breaching the Agreement by attempting to manufacture and sell Licensed Products for which it has granted to FTC an exclusive license, and by notifying FTC's customers that they may no longer advertise FTC's licensed products.

40.      FTC is entitled to a declaratory judgment that the Agreement remains in effect, and that FTC may continue to manufacture and sell licensed products pursuant to that Agreement.

41.      FTC has already commenced the expensive and labor-intensive process of manufacturing these products.  If WWE is allowed to terminate the Agreement, FTC will be forced to let go of employees and suffer significant damages, as well as irreparable damage to its business and goodwill.

## COUNT 2

### BREACH OF AGREEMENT

42.     FTC repeats and realleges the allegations in the foregoing paragraphs as though fully set forth herein.

43.     Under the Agreement, FTC has an exclusive right to manufacture, distribute, and sell the WWE Replica Belts.  On information and belief, WWE has breached and continues to breach the Agreement by making preparations to itself manufacture the WWE Replica Belts, including by recently contacting FTC's Chinese manufacturer to discuss the manufacturing of the licensed products.

44.     Upon information and belief, WWE has contacted FTC's Chinese manufacturer of the WWE Replica Belts and has attempted to negotiate a direct manufacturing deal with the manufacturer to the exclusion of FTC.

45.     WWE's breach has caused and will cause irreparable harm to FTC's business and reputation.

## COUNT 3

### TORTIOUS INTERFERENCE WITH PLAINTIFF'S BUSINESS

46.     FTC repeats and realleges the allegations in the foregoing paragraphs as though fully set forth herein.

47.     Under the Agreement, FTC has an exclusive right to manufacture, distribute, and sell the WWE Replica Belts.  Upon information and belief, WWE recently has contacted FTC's

Chinese manufacturer of the WWE Replica Belts to meet about the manufacturing of the licensed products.

48.     WWE's actions have irreparably harmed the business and reputation of FTC both among its manufacturers and its customers.  WWE's actions have caused significant financial loss to FTC.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, FTC hereby requests a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

- A permanent and preliminary declaration that the Agreement remains in full force and effect and is otherwise enforceable by and against the parties thereto, and their successors and assigns;

- A permanent and preliminary declaration that there is no existing basis for termination of the Agreement;

- A permanent and preliminary injunction preventing WWE from attempting to manufacture the licensed products itself in violation of the exclusivity clause of the Agreement;

- A permanent and preliminary injunction preventing WWE from contacting FTC's customers and telling them to remove FTC's advertisements from their publications, and from otherwise interfering with the Agreement;

- Monetary damages for Defendant's breach of contract and tortious interference with Plaintiff's business, as well as reasonable costs and attorneys fees; and

- Any further relief as the Court deems just and proper.

Respectfully Submitted,

FIGURES TOY COMPANY

BY:     _____/S/ (ct06645)_____

MARK R. CARTA
Carta, McAlister & Moore, LLC
1120 Post Road, Post Office Box 83
Darien, Connecticut 06820
Telephone (203) 202-3100/Facsimile (203) 202-3102
Mark@CMM-Law.com

John J. Dabney (pending *pro hac vice* )
Katie Bukrinsky (pending *pro hac vice*)
Mary D. Hallerman (pending *pro hac vice*)
McDermott Will & Emery LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Telephone: 202.756.8000
Facsimile: 202.756.8087
Email: jdabney@mwe.com
        kbukrinsky@mwe.com
        mhallerman@mwe.com

*Attorneys for Plaintiff*