# EXHIBIT 1

## WORLD WRESTLING ENTERTAINMENT, INC.
## CONSUMER PRODUCTS LICENSE AGREEMENT

THIS WORLD WRESTLING ENTERTAINMENT, INC. CONSUMER PRODUCTS LICENSE AGREEMENT ("Agreement"), effective July 1, 2009 ("Effective Date"), by and between WORLD WRESTLING ENTERTAINMENT, INC., a Delaware corporation with its principal office at 1241 East Main Street, Stamford, Connecticut 06902 ("WWE"), and FIGURES TOY COMPANY with an office at 12826 Commodity Place, Tampa, Florida 33626 ("Licensee"). In consideration of the promises and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby established, WWE and Licensee hereby agree as follows:

1. <u>Definitions</u>. For purposes of this Agreement the following definitions shall apply:

a) The term "<u>Advertising Materials</u>" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration but not limitation, television commercials, radio ads, print ads, catalogs, trade advertisements, sweepstakes, promotions, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of, reference and/or exploit the Intellectual Property.

b) The term "<u>Copyrights</u>" shall mean the copyright interest in any and all materials, provided to Licensee by WWE or any third party or otherwise created in connection with this Agreement, including but not limited to text, photographs, film, images, designs, music, likenesses, characters, translations, composit works, DVDs, videos, CDs, books, magazines and advertising, marketing, and promotional materials, now or hereafter owned by WWE.

c) The term "<u>Events</u>" shall mean the professional wrestling Programs produced, promoted, and performed by WWE, whether live or tape delayed and whether via television, satellite or any other method of dissemination now known or hereinafter discovered, provided however, that the term "<u>Events</u>" shall not under any circumstances be defined to include (i) any film, comic, cartoon, or animated events, (ii) any characters, characterizations, designs or visual representations of such film, comic, cartoon or animated events, which includes by way of example and not limitation in each of the foregoing instances depictions taken from film, comic books, magazines, animated television programs and comic, cartoon or animated internet events, even if such events (or the characters, designs or visual representations taken therefrom) are subsequently produced, promoted or performed by WWE.

d) The term "<u>Intellectual Property</u>" or "<u>Licensed Marks</u>" shall mean the Rights of Publicity, the Trademarks, and/or Copyrights in such form as they may exist from time to time, in WWE's sole discretion, and which are owned by WWE and related to the Talent and/or the Events. For the avoidance of doubt and without any limitation hereof the foregoing definition of "<u>Intellectual Property</u>" shall not include any other intellectual property rights not set forth herein.

1

e) The term "<u>Licensed Products</u>" shall collectively mean the use of the WWE Intellectual Property in a form and manner approved by WWE pursuant to the terms hereof, on the following items only:

### (i)  WWE Replica Belts:

- *WWE Championship Replica Belts:  The term "WWE Championship Replica Belts" shall be defined as belts that are identical to the WWE championship belts.  These belts are made of simulated leather and sold in adult, children and mini sizes.  The SRP's for these belts are:  Adult $199 to $399; Children $109 to $199; and Mini $30 to $65;*

- *Deluxe WWE Championship Replica Belts:  The term "Deluxe WWE Championship Replica Belts" shall be defined as WWE Championship Replica Belts made of leather and sold in adult sizes only. The SRP for these belts is:  Adult $399 to $2,000;*

- *Reggie Parks Replica Belts:  The term "Reggie Parks Replica Belts" shall be defined as the Winged Belt, Inter-Continental Belt, 1986 Heavyweight Belt, WCW Classic Heavyweight Belt, WCW Classic Tag Team Belt, 1987 Heavyweight Belt and AWA Championship Belt, designed by Reggie Parks and sold in adult, children and mini sizes, the rights of which are owned by Reggie Parks.  The SRP's for these belts are:  Adult $199 to $399; Children $109 to $199; and Mini $30 to $65.*

(collectively the "WWE Replica Belts").

These belts cannot be defined as role play items and cannot be sold in the toy aisle.

### (ii)  Other Product (the rights for which are granted on a non-exclusive basis in all territories):

- *WWE Commemorative Belts:  The term "WWE Commemorative Belts" shall be defined as belts that are identical to WWE championship belts but are made of lower grade, less expensive simulated leather than the WWE Replica Belts described above, and sold in adult and children sizes.  The SRP's for these belts are: Adult $75 to $150; Children $30 to $80.  (These belts cannot be defined as role play items and cannot be sold in the toy aisle.);*

- *WWE Clocks:  The term "WWE Clocks" shall be defined as clocks that use the center plates of the WWE Championship Replica Belts, as defined above;*

2

- *Replica Masks: The term "Replica Masks" shall be defined as those masks that are identical to the masks or face paint worn by WWE talent at an Event, provided that WWE owns the rights to the masks and approves the creation of each individual mask as provided for in this Agreement. (These masks cannot be defined as role play items and cannot be sold in the toy aisle.);*

- *Replica John Cena Spinning Pendant: The term "Replica Pendants" shall be defined as the replica version of the pendant that is worn by John Cena at the Events;*

- *Belt Buckles: The term "Belt Buckles" shall be defined as belt buckles which replicate the centerplates of WWE Championship Replica Belts as defined above;*

- *Replica Rey Mysterio Pants: The term "Replica Rey Mysterio Pants" shall be defined as those pants that are identical to the pants worn by Rey Mysterio at a WWE Event, provided that WWE owns the rights to the pants and approves the creation of each individual pants as provided for in this Agreement. (These pants cannot be defined as role play items and cannot be sold in the toy aisle). The SRP for the Replica Pants is $99; and*

- *Jewelry Rings featuring the likeness of WWE Championship Belts or featuring the image of WWE Superstars, to be sold at a SRP of $20 to $300.*

Licensed Products are in no event to be in the form of a figurine unless specifically stated herein.

f)   The term "Net Sales" shall mean the sum of the Licensee's per unit documented and/or invoiced billing price for Retail Sales or Wholesale Sales, as defined in this Agreement, for all Licensed Products sold by Licensee, less any returns for damaged goods. If the Licensee sells a Licensed Product to a subsidiary or other party controlled by the Licensee ("Sublicensee"), on the basis of the per unit price for Retail Sales or Wholesale Sales for such Licensed Product charged by such Sublicensee on resale of the Licensed Product.

g)   The term "Retail Sales" means the sale of the Licensed Product by Licensee directly to the paying public, and includes the sale of Licensed Product by means of retail outlets such as brick and mortar stores, sales through Licensee's own website and similar methods.

h)   The term "Rights of Publicity" shall mean the likenesses, physical characteristics, personalities, characters, and personas of the Talent, provided however that the term "Talent" shall not under any circumstances be defined to include any film, comic, cartoon, animated designs and/or characterizations of Talent whether taken from an Event or otherwise.

i) The term "Talent" shall mean all individuals who are under a booking contract, independent contract or other similar agreement with the WWE and have granted WWE the

3

licensing rights as set forth herein, provided however that the term "Talent" shall not under any circumstances be defined to include · any film, comic, cartoon, animated designs or characterization of Talent whether taken from an Event or otherwise.

　　j)　The term "Territory" shall mean worldwide.

　　k)　The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks now or in the future created and in whatever style and/or form determined by WWE in its sole discretion and which are owned by WWE and used in connection with the Events and/or Talent, including, but not limited to, the name World Wrestling Entertainment, Inc., the scratch and scar logo or logos, the names and logos of the Events, and the names, nicknames, logos, expressions or other distinctive and identifying indicia of the Talent, but excluding the initials WWF in any form, the WWF scratch and scar logo, the name World Wrestling Federation, and any trademarks owned or associated with WCW, Inc., or any subsidiary or affiliated entity of WWE.

　　l)　The term "Wholesale Sales" means sales of Licensed Product to wholesalers, rack jobbers, retailers and other distributors, which, in turn, sell to the paying public. For purposes of this Agreement, a distributor is an entity whose sole responsibility is to sell inventory into approved channels of distribution. To the extent that a distributor is in any way involved in duplication, manufacturing, advertising, marketing or promotion of the Licensed Products, such entity shall be considered a Sublicensee as referenced in Section 1(f) above, and in calculating amounts due Licensor, Net Sales must be calculated based on Sublicensees sales to third parties, not on Licensees sales to Sublicensees.

　　2.　Grant of License; Channels of Distribution Reserved to WWE.

　　a)　Grant of License.

　　(i)　Licensed Products. WWE grants to Licensee, upon the terms and conditions set forth in this Agreement, the non-exclusive right and license to use the Intellectual Property in connection with the manufacture, distribution and sale of the Licensed Products in the Territory during the Term of this Agreement, as defined below, with the exception of all types of WWE Replica Belts, which are exclusive in the United States of America, its territories, possessions and protectorates only, through all channels of distribution except those specifically reserved to WWE under subparagraph 2(b)(i) or those specifically prohibited by subparagraph 2(b)(ii). The right and license granted by WWE hereunder shall however pertain only to the items specifically described and set forth in subparagraph 1(e) above entitled "Licensed Products."

　　(ii)　Advertising Materials. During the Term, as defined below and only within the Territory, WWE grants to Licensee, upon the terms, conditions, and definitions set forth throughout this Agreement, the right and license to use the Intellectual Property approved by WWE in writing in connection with the design, development and distribution of Advertising Materials for the Licensed Products.

4

(iii) <u>Purchase by WWE of Licensed Products</u>. During the First Contract Year and the Second Contract Year, WWE will purchase WWE Championship Replica Belts and Deluxe WWE Championship Replica Belts, if any and in its sole discretion, exclusively from Licensee.

b) <u>WWE's Channels of Distribution</u>

(i) Unless specifically stated to the contrary herein (or approved in advance in writing by WWE), the rights granted to the Licensee by WWE under subparagraph 2(a) shall not include the right to sell, distribute, manufacture, market, display and/or advertise the Licensed Products through any of the following channels of distribution which are reserved specifically for use by WWE: (i) WWE Events; (ii) WWE direct sales methods (e.g., WWE catalogs, WWE websites, WWE wireless or other electronic distribution channels or WWE direct marketing campaigns); (iii) WWE television programs; and (iv) wireless or other electronic media now known or hereinafter discovered.

(ii) During the Term of this Agreement, as defined below, Licensee, its distributors, manufacturers, vendors, agents and/or representatives agree not to sell, distribute or otherwise disseminate any of the Licensed Products within a five (5) mile radius of an Event. The preceding sentence does not include retailers and/or wholesalers, as those terms are customarily understood, with permanent pre-existing storefronts within that five (5) mile radius. Licensee agrees to enter into a written agreement with every distributor, manufacturer, vendor, agent or other representative involved with the Licensed Products in any manner and incorporate into such agreements the limitations specifically set forth in this paragraph for the sole benefit and protection of WWE's rights hereunder. Licensee further agrees to furnish WWE within thirty (30) days of their execution, copies of all agreements with such entities. The failure to comply with any aspect of this paragraph is a material breach and WWE shall have the right to immediately terminate this Agreement.

c) <u>Continuous Update of Licensed Products</u>. As a condition to the foregoing grant of license, it is understood and agreed that Licensee will update, sell and distribute new designs for each and every item set forth under the definition of the Licensed Products at least every six (6) months during the Term, as defined below, or be subject to termination as determined in WWE's sole discretion. At the time new designs are created, Licensee shall sell off the remaining inventory for the old designs or destroy them, at WWE's sole discretion. If the Licensee is instructed to sell the remaining inventory, it shall pay WWE a royalty on such sales based upon either the royalty percentage of actual Net Sales of each of the Licensed Products or the average per unit royalty amount paid to WWE for each of the Licensed Products in the previous two (2) Quarters, whichever is greater.

d) <u>Co-Branding Opportunities</u>. WWE reserves the right to co-brand its Intellectual Property with any other item of intellectual property owned by a third party in any of the categories that are set forth herein including the Licensed Products, as defined herein ("Co-Branding Opportunities") and such Co-Branding Opportunities shall not be deemed a violation or breach of this Agreement.

G:\Department\Legal Affairs\Consumer Products License\Licensee Agreements\Figures Toy Company\2009\Figures Toy Co License Agreement 2009 FINAL 07-09-09 (jgc).doc

3. <u>Period of Agreement</u>. The period of this Agreement shall commence on the Effective Date and end on June 30, 2012 (hereinafter "Term"), unless terminated earlier pursuant to the terms hereof. Each individual year of the Agreement may also be hereafter referred to as a Contract Year (i.e. First Contract Year: July 1, 2009 through June 30, 2010; Second Contract Year: July 1, 2010 through June 30, 2011; Third Contract Year: July 1, 2011 through June 30, 2012).

4. <u>Royalties</u>. In consideration of the rights granted to it under this Agreement, the Licensee agrees to pay WWE the following royalties:

a) <u>Minimum Guarantee</u>. Licensee agrees to pay to WWE directly a non-refundable, recoupable minimum guaranteed royalty amount ("Minimum Guarantee") for each Contract Year as follows:

*First Contract Year:  One Hundred Thirty Thousand US Dollars ($130,000.00 USD) to be paid as follows:*

- $32,500.00 USD to be paid upon Licensee's execution of this Agreement;

- $32,500.00 USD to be paid no later than October 1, 2009;

- $32,500.00 USD to be paid no later than January 1, 2010;

- $32,500.00 USD to be paid no later than April 1, 2010;

*Second Contract Year:  One Hundred Thirty Thousand US Dollars ($130,000.00 USD) to be paid as follows:*

- $32,500.00 USD to be paid no later than July 1, 2010;

- $32,500.00 USD to be paid no later than October 1, 2010;

- $32,500.00 USD to be paid no later than January 1, 2011;

- $32,500.00 USD to be paid no later than April 1, 2011;

*Third Contract Year:  One Hundred Thirty Thousand US Dollars ($130,000.00 USD) to be paid as follows:*

- $32,500.00 USD to be paid no later than July 1, 2011;

- $32,500.00 USD to be paid no later than October 1, 2011;

- $32,500.00 USD to be paid no later than January 1, 2012;

- $32,500.00 USD to be paid no later than April 1, 2012;

(collectively referred to as the "Minimum Guarantees").

b) <u>Percentage Royalties</u>. Percentage royalties shall be computed as follows:

(i) <u>Royalty Rate</u>. Licensee shall pay WWE a percentage royalty ("Royalty") of twelve percent (12%) of the Net Sales on all Wholesale Sales and six percent (6%) of the Net Sales on all Retail Sales of the Licensed Products by the Licensee to its customers or distributors (the "Royalty Payment(s)"), which amount shall be recouped against the Minimum Guarantees. The only exception to the foregoing will be for sales of the following WWE Replica Belts in all sizes directly to WWE, which sales will be royalty-free: WWE Championship "Spinner" Belts, WWE World Heavyweight Championship Belts #2 and #3, ECW Championship Belts, Unified Tag Team Championship Belts, and all future new or re-designed WWE Championship Title Belts that WWE may develop during the Term.

(ii) All royalty computations under this subparagraph 4(b) shall be made on the basis of the Net Sales as defined in 1(f) above.

c) <u>Quarterly Payments</u>.

(i) During each Contract Year, within fifteen (15) days following the end of each calendar Quarter or on the dates provided (a "Quarter"), Licensee shall pay WWE the actual Royalty Payment accrued that Quarter less the Minimum Guarantee already paid to WWE pursuant to Paragraph 4(a) above.

Notwithstanding anything herein to the contrary, Licensee's obligation to pay the Minimum Guarantee for a given Contract Year and/or Quarter, as described above, shall not change even if in any previous Contract Year or Quarter Licensee makes Royalty Payments that are greater than the Minimum Guarantee due for that Contract Year or Quarter. Royalties may not be carried over from Contract Year to Contract Year or from Quarter to Quarter unless, in the case of Quarterly payments of the Minimum Guarantee, the entire Minimum Guarantee for the Contract Year has been recouped in the prior Quarter, in which case Licensee shall only be obligated to pay the actual Royalty Payment due for the remaining Quarters of that Contract Year. For example: if the Minimum Guarantee for the Contract Year is $100,000.00, payable in four Quarterly installments of $25,000.00 and Licensee pays WWE $50,000.00 in Royalties in the first Quarter and $50,000.00 in the second Quarter then the Licensee would only owe the actual Royalties earned for the third and fourth Quarters.

(ii) <u>Acceleration Clause</u>. In the event this Agreement is terminated early for any reason whatsoever, Licensee shall remain obligated to pay the Minimum Guarantee set forth above for each Contract Year remaining under the Agreement as of the date of termination, less any payments previously made under Paragraphs 4(a) and (b) above for the current year at the time of such termination.

(iii) <u>No-Cross Collateralization</u>. Any Royalty Payment for a unit of Licensed Product sold will only be applied against the Minimum Guarantee for such Contract Year in which the unit of such Licensed Product was sold (i.e. any shortfall in, or payment in excess of the Minimum Guarantee for a Contract Year may not be offset or credited against the Minimum Guarantee for any other Contract Year). If the Minimum Guarantees are stated separately for different categories of Licensed Products (or for different countries within the Territory),

Royalty Payments resulting from Net Sales of a category of Licensed Product (or from Net Sales of a country) will be applied only against the Minimum Guarantee for such category of Licensed Product (or against the Minimum Guarantee for such country).

    5. <u>Photographs, Artwork, Video Footage, Music or Sound Bytes for Licensed Products.</u>

        a) In the event that Licensee requests WWE to furnish Licensee with any photographs, artwork or video footage incorporating the Intellectual Property, or any music or sound bytes by the Talent, Licensee agrees to reimburse WWE for its cost and expense of supplying any of the materials described herein to the Licensee in accordance with WWE's then current policies regarding same, which shall include but shall not be limited to duplication and copying costs, search and edit fees, Talent fees, music clearance or any other rights clearance costs. If rights clearance costs are to be paid to a third party, WWE will so inform Licensee and Licensee agrees to pay such third party all sums due for the use of the rights in question and provide WWE with documentation of same. In addition, if Licensee is granted permission by WWE, in writing, to license third party intellectual property, directly from the third party, for use under this agreement, Licensee agrees to pay such third party all sums due for the use of the rights and to provide WWE with documentation of same. If Licensee fails to pay WWE or such third party within ten (10) days after receipt of an invoice for these costs, WWE may terminate this Agreement immediately.

        b) Licensee understands and agrees that it shall not supply any images it obtains from WWE's artbank, the password to the artbank, any duplicates of films, or any photographs, artwork, video footage or other reproductive media incorporating the Intellectual Property or music to any third party (including other WWE licensees) without the specific written permission of WWE and doing so shall be a material breach of this Agreement.

    6. <u>Non-Competition</u>. Licensee, its parent, subsidiaries, affiliates, successors, assigns and related companies agree that they shall not, while this Agreement remains in effect and for one (1) year thereafter, produce any products or provide any services, including by way of example and not limitation advertisements, promotions and/or sponsorships, using: (a) the names, logos or other trademarks or service marks associated with any professional wrestling organization other than WWE; (b) the names, logos or other trademarks or service marks associated with any boxing organization, professional wrestling competitions and/or exhibitions, amateur wrestling organization, mixed martial arts and/or ultimate fighting organization; (c) the names and/or likenesses of any professional wrestlers not associated with WWE; and/or (d) to the extent permitted by law, advertise via any professional wrestling media other than WWE's advertising channels.

    7. <u>Submission of Marketing Plans/Quarterly Reports.</u>

        a) <u>Distribution/Marketing Plans</u>. At any time, within thirty (30) days after WWE's request, Licensee shall provide WWE with a written marketing plan (on forms provided and approved by WWE) with respect to the Licensed Products. Each such marketing plan will include, on a Licensed Product-by-Product basis, a marketing timetable, sales projections by calendar quarter, channels and methods of distribution, on sale dates, the nature and amount of

8

the anticipated advertising and advertising expenditures associated therewith and any other information that WWE may reasonably ask Licensee to include related to the manufacture, marketing, sale and distribution of the Licensed Products. In order to assist WWE in reviewing Licensee's ongoing marketing activities, the Licensee agrees to furnish WWE within thirty (30) days of WWE's request complete information evidencing on a country-by-country basis the Licensee's efforts to market the Licensed Products in such countries.

     b) <u>Quarterly Financial Reports.</u> Within ten (10) business days after WWE's and/or WWE's agent's request, Licensee will provide WWE with a written financial report updating the Immediate Year Projection, providing comparisons of actual Licensee sales of the Licensed Products against the projection of such sales and compiling any such other information WWE may reasonably request related to the manufacture, marketing, distribution and sale of the Licensed Product herein.

    8. <u>Advertising Expenditures.</u>

     a) Licensee will be required to purchase twelve (12) full page advertisements, at the then current rate, in WWE publications each contract year ("Advertising Expenditures").

     b) In addition to the submission of marketing plans and financial reports as identified in Paragraph 7 above, Licensee will also keep accurate account and copies of all documents and records relating to said Advertising Expenditures and will be required to send reports to such Advertising Expenditures upon WWE's request describing the nature and amounts expended related thereto, simultaneously with its submission to WWE of its quarter royalty statements.

    9. <u>Display of Official Tag.</u>

     a) Licensee agrees and shall undertake to attach to each Licensed Product and/or its container an "Officially Licensed WWE Product" hologram tag or label in a form prescribed and/or approved by WWE ("Official Tag"). During the Term hereof, Licensee agrees to purchase at its own cost and expense its Official Tag(s) from WWE's approved hologram supplier. The specific details and instructions necessary for the purchase of the Official Tag(s) shall be provided to Licensee shortly after the execution of this Agreement. In addition, Licensee shall also cause its own name to appear on a tag or label on each Licensed Product and/or its container in a form prescribed and/or approved by WWE. Failure to attach an Official Tag to the Licensed Product is a material breach of this Agreement, which shall be cause for immediate termination hereof.

     b) Licensee agrees to defend, indemnify and hold WWE and its licensees, successors and assigns, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, shareholders, employees, advertisers, insurers, and representatives harmless from any and all liabilities, claims, suits, costs, judgments, damages, including but not limited to reasonable attorney fees including an appropriate allocation for in house counsel, related in any manner to Licensee's failure to comply with the terms and conditions of Paragraph 9(a) above, which includes without limitation (i) Licensee's failure to affix the Official Tag and/or its own name to any Licensed Product or its container pursuant to Paragraph 9(a) above and/or (ii)

9

related in any manner to the seizure of any of the Licensed Products by WWE or its authorized representatives as a result of a breach of the terms and condition of this Paragraph 9. This provision is in addition to and in no way limits Section H in the Standard Terms and Conditions attached hereto.

10. <u>Licensee Acknowledgement.</u> The Licensee by executing this Agreement acknowledges that it has reviewed and understands all provisions of this Agreement, including the attached Standard Terms and Conditions. Licensee further acknowledges that this Agreement supersedes all prior agreements between Licensee and WWE, whether written or oral.

11. <u>Standard Terms and Conditions.</u> This Agreement is subject to all of the provisions of the Standard Terms and Conditions that are attached to and made a part of this Agreement by reference.

12. <u>Attorney Acknowledgement.</u> Each of the parties has reviewed the terms of this Agreement with their respective attorneys and, as a direct result, thereof, has participated in the drafting of this Agreement. Therefore, the language of this Agreement shall not be presumptively construed in favor of or against any party hereto. Based on the foregoing, the parties have executed the Agreement with the consent and acknowledgement of their attorneys.

IN WITNESS WHEREOF, the parties with the intent to be legally bound have executed this Agreement as of the date set forth above. Agreed to and accepted:

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By: _Jim Connelly_
Jim Connelly
Senior Vice President, Consumer Products

Date: _8/11/09_

FIGURES TOY COMPANY
("Licensee")

By: _Stephen Sandberg_
Print Name: _Stephen C. Sandberg_
Title: _CEO_

Date: _8/5/09_

10

WORLD WRESTLING ENTERTAINMENT, INC.
LICENSE AGREEMENT STANDARD TERMS AND CONDITIONS

SECTION A.    QUALITY CONTROLS AND APPROVAL PROCEDURES FOR
LICENSED PRODUCTS AND ADVERTISING MATERIALS

A(1)    Warranty of Quality.    The Licensee warrants, represents and guarantees that the Licensed Products will be of good quality in design, material, and workmanship and will be suitable for their intended purpose; that no injurious, deleterious, or toxic substances will be used in or on the Licensed Products; that the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and that the Licensed Products will be manufactured, sold, and distributed in strict compliance with all applicable laws and regulations.    Licensee agrees not to ship, sell or have its manufacturer(s) ship or sell any Licensed Products or component parts of the Licensed Products containing the Intellectual Property if they are damaged, defective, irregular, seconds, or otherwise unacceptable to the Licensee and/or WWE.

A(2)    Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by WWE.

a)    General.    Licensee shall comply with all reasonable procedures which WWE may from time to time adopt regarding its approval of Licensed Products and Advertising Materials.    It is acknowledged and agreed by Licensee that these approval procedures shall incorporate, at a minimum, the basic approval requirements and steps outlined in the following subsections of Section A and such other requirements as from time to time requested by WWE, as WWE shall determine in its best interest.    Licensee agrees to retain all materials relating to approvals in its files while this Agreement remains in effect and for one (1) year thereafter.

b)    Approval of Licensed Products.    With respect to each different Licensed Product which the Licensee proposes to manufacture and sell under this Agreement, Licensee shall submit to WWE for its review and approval the following materials in the order stated:

i)    a written concept of product including the product description/specs/how the product functions;

ii)    a pre-production prototype including the finished art for the Licensed Product, showing the exact use of the Intellectual Property on or in connection with the proposed Licensed Product;

iii)    a preproduction final sample of the Licensed Product, showing in either case the exact form, finish, and quality the Licensed Product will have when manufactured in production quantities; and

iv)    Six (6) identical production samples of each of the Licensed Product to be submitted immediately upon commencement of production.

11

v)    The Licensee shall comply with all of the foregoing approval steps for each Licensed Product, obtaining WWE's written approval at each step of the procedure unless by prior written notice from WWE it is exempted from any such step with respect to a specific Licensed Product.

c)  Approval of Advertising and Promotional Materials.  With respect to each different item of advertising or promotional material which Licensee (or any party acting on its behalf) proposes to produce and use under this Agreement, Licensee shall submit to WWE for its review and approval the following materials, in the order stated:

i)    proposed written copy for the item of advertising or promotional material, with attached rough art showing how the Intellectual Property will be used in connection with the copy; and

ii)   a final printed sample of the item, where feasible (as, for example, in the case of printed brochures, catalogs, and the like).

iii)  Failure to comply with the foregoing approval process for advertising and promotional materials may result in immediate termination of the Agreement by WWE.

d)  Approval of Commercial Announcements.    For any commercial announcements which Licensee (or a third party acting on its behalf) proposes to produce with respect to the Licensed Products, Licensee shall submit to WWE for its review and approval the following:

i)    proposed written copy with story boards for the commercial;

ii)   the rough cut of the commercial; and

iii)  the final version of the commercial with all changes that WWE requested.

e)  Approval of Press Releases.  Licensee shall not make any statements to the press or any media source or distribute any written release, promotional literature, publicity or news story regarding the subject matter of this Agreement or WWE without WWE's prior written approval in each instance.

f)  Approval Standards.  WWE shall have the right to disapprove any materials submitted to it under Sections A(2)(b), A(2)(c) or A(2)(d) if it determines, in its sole and unfettered discretion, that the materials in question would impair the value and good will associated with the Intellectual Property, Talent or the Event.

g)  Time for Approval by WWE.  WWE agrees to use reasonable efforts to notify the Licensee in writing of its approval or disapproval of any materials submitted to it under Sections A(2)(b), A(2)(c) and A(2)(d) within twenty (20) days after its receipt of such materials, and agrees, in the case of its disapproval, to notify the Licensee in writing of its reasons for disapproval.  In the event WWE fails to approve or disapprove of any materials submitted as

G:\Department\Legal Affairs\Consumer Products License\Licensee Agreements\Figures Toy Company\2009\Figures Toy Co License Agreement 2009 FINAL 07-09-09 (jgc).doc

provided for above within twenty (20) business days after WWE's receipt of such materials, the materials shall be deemed disapproved.

       h) <u>Maintenance of Quality of Licensed Products; Inspection of Production Facilities</u>. Licensee agrees to maintain the quality of each Licensed Product manufactured under this Agreement at or above the specifications, quality, and finish of the production sample for such Licensed Product as originally approved by WWE under Section A(2)(b) WWE shall have the right to inspect Licensees inventory to insure such quality, at any time, with twenty four (24) hours notice.

       i) <u>Limitations on Approval</u>. WWE's approval of a Licensed Product shall not be construed in any way as an acknowledgement that such Licensed Product is in compliance with the warranty of quality asserted by Licensee in subparagraph A(1) above and/or that such Licensed Product is in compliance with any and all applicable laws, regulations and industry standards. Instead the production of random samples of the Licensed Products during the approval process is required for the purposes of monitoring Licensee's adherence and compliance with internal WWE policies and procedures concerning the WWE brand, which includes without limitation the look, depiction and style of the Licensed Products and, to that end such internal review by WWE shall not be construed in any way as WWE's approval of any warranty (express or implied) for the Licensed Products. With regard to the Licensed Products compliance with the warranty of quality asserted in subsection A(1) and/or in all applicable laws and regulations in the Territory, it is understood and agreed that WWE shall rely solely on the representations and warranties of Licensee hereunder. For the purposes of absolute certainty, WWE's approval of a design for a Licensed Product in no way acknowledges that the submitted product is in compliance with any and all such applicable laws within the Territory and furthermore is in no way an approval of the underlying product upon which the design is depicted.

       j) <u>Revocation of Approval</u>: In the event that: (i) the quality, appearance, material or style of any Licensed Products cease to meet standards previously approved by WWE; (ii) Licensee uses the Intellectual Property, in an improper or unauthorized manner or such use violates any of the terms of this Agreement or (iii) there is an occurrence or factor connected with any such Licensed Product which, in the opinion of WWE, reflects unfavorably upon the professional or business reputation of WWE, then, in such event, WWE will have the right, in its sole discretion, to immediately withdraw and/or revoke its approval for such Licensed Product. In the event of such withdrawal or revocation, WWE will provide immediate written notice to Licensee and Licensee will, upon receipt of said notice, (i) cease the use of the Intellectual Property at issue and/or the sale, distribution, advertisement or use of the Licensed Product at issue as directed by WWE's written notice and (ii) immediately withdraw and destroy such Licensed Product. If there are other Licensed Products for which approval has not been withdrawn or revoked pursuant to this Section, then this Agreement will remain in full force and effect as to such other Licensed Products. Licensee will provide written confirmation and a certificate of destruction to WWE indicating that any Licensed Products, have been promptly and properly deleted from Licensee's product lines and any existing inventory has been destroyed.

13

k) <u>Change of WWE Marks or Logos</u>. WWE shall have the right in its sole discretion and for whatever reason, to change the WWE marks or logos and Licensee shall do so immediately. No such change shall result in a breach of this Agreement. In such case, WWE shall have the right to revoke its approval of any and all products pursuant to Section A(2)(j) and WWE shall not be responsible for any and all costs associated therewith.

A(3)   <u>Miscellaneous</u>.

a) <u>Translations</u>.  All translations of written material used on or in connection with the Licensed Products or Advertising Materials shall be accurate and to the extent a word or phrase does not have an applicable translation the English word or phrase shall be used.  No translation shall be made for a Talent name, a logo, the name World Wrestling Entertainment, Inc. or any other trademark or element as specified by WWE.  In all other circumstances the Licensee, when submitting the Licensed Products and the Advertising Materials for approval, shall provide WWE with translations of all such written materials in English.  All translations shall be created as works made for hire and to the extent that they are not created as works made for hire, all right title and interest, including but not limited to copyright in such translations shall be assigned solely and exclusively to WWE and Licensee shall provide WWE with documentation of such work made for hire or assignment agreements.

b) <u>No Endorsement</u>.  Licensee will not use the name or likeness of any Talent or any items contained within the definition of Intellectual Property as set forth above as an endorsement of the Licensee and/or any of the Licensee's services, without WWE's prior written consent.

c) <u>Use of Intellectual Property on Licensee Business Forms</u>.  No use of the Intellectual Property will be printed by Licensee on its stationery, envelopes, business cards, invoices, statements, packing slips or other similar documents or materials.

<u>SECTION B</u>. <u>EFFORTS   TO   MANUFACTURE,   DISTRIBUTE,   SELL   AND OTHERWISE EXPLOIT THE LICENSED PRODUCTS; RESTRICTIONS ON SALE; COMPLIANCE</u>.

B(1)   <u>Efforts to Design and Manufacture the Licensed Products</u>.

a) <u>Good Faith Effort to Exploit Rights</u>.  If within three (3) months of the Effective Date of this Agreement, Licensee has failed to take good faith steps to exploit the rights granted to it, including the creation of prototypes of each item of the Licensed Products and seeking to obtain WWE's approval of same, WWE shall have the immediate right to: terminate this Agreement; rescind the exclusive nature of the Agreement; or delete individual licensed products from the definition of Licensed Products in subparagraph 1(e), as shall be determined by WWE in its sole discretion.

b) <u>WWE's Right to Eliminate a Country from the definition of Territory</u>. If over any two (2) consecutive quarters during the Term, the Licensee is not making sufficient sales of any of the Licensed Products in a particular country within the Territory, as determined by WWE in its sole discretion, WWE shall have the right, upon thirty (30) days prior written notice to the

14

Licensee, to terminate the Licensee's rights for the Licensed Products for such country. Upon receipt of such notice, Licensee will immediately cease shipping and manufacturing the Licensed Products to such country.

B(2)   <u>Efforts to Distribute the Licensed Products</u>.  In the event Licensee sells or distributes other licensed merchandise of a similar grade or quality as the Licensed Products, but which do not bear the Intellectual Property, Licensee will not discriminate, in a manner which adversely impacts the Licensed Product, in the granting of commissions and discounts to salesmen, dealers and distributors between the Licensed Products and the licensed products of any third party.  Licensee may not package the License Products in combination with other products, whether similar or different, without the prior written approval of WWE in its sole discretion.

B(3)   <u>Efforts to Market, Promote or Advertise the Licensed Products</u>. In furtherance of the terms of Paragraph 8 above, Licensee will advertise, market and promote the Licensed Products at its own expense and sell the Licensed Products in the Territory.

B(4)   <u>Selling Practices</u>.  Licensee acknowledges WWE's legitimate and reasonable interest in protecting the value of the Intellectual Property and maximizing the effectiveness of WWE's advertising, promotion and distribution efforts by segmenting the classes of trade into which its licensees sell.  Therefore, Licensee will only sell the Licensed Products to a buyer that, to its best knowledge, (i) purchases Licensed Products from Licensee solely for sale directly to the consumer and operates a retail establishment that supports the high quality and image of WWE officially licensed products with appropriate merchandising displays, promotions and/or customer service or (ii) sells to retailers that support the high quality and image of WWE officially licensed products.  Neither Licensee nor any party Licensee sells to shall discount the Licensed Products by more than 50% of the wholesale price or 50% of the retail price, whichever is applicable.  Licensee acknowledges that a failure to comply with the selling practices set forth in this Section will cause significant harm to WWE efforts to effectively and efficiently distribute WWE related licensed products and will be considered a material breach of this agreement.

B(5)   <u>Restrictions on the Marketing, Promotion, Advertising and Sale of the Licensed Products</u>.

a) <u>Prohibition Against Premiums</u>: The term "<u>Premiums</u>" shall mean anything given free or sold at substantially less than its usual selling price (but does not include sales made pursuant to periodic price reductions resulting from "specials," "sales" or volume pricing discounts authorized by WWE) for the purpose of increasing the sale of, or publicizing, any product or service, or such other giveaway or promotional purposes.  Any and all rights relative to "Premiums" as it concerns the Licensed Products are specifically reserved by and for WWE's use and WWE will have the right to exploit such "Premiums," without any compensation due Licensee and without WWE or any third party affiliated with WWE being in breach of any of the terms of this Agreement.   Licensee acknowledges and agrees that it shall not use the Licensed Products as a "Premium" in any form or manner whatsoever, including as a marketing tool for the sale of any other Licensed Product, without the prior written approval of WWE and in each

15

and every instance where approval has been given, the parties will enter into a separate WWE premium agreement, which may be in the form of e-mail, at WWE's sole discretion.

b) <u>Promotions; Sweepstakes for the Licensed Products</u>. Under no circumstances will lotteries, games of chance, sweepstakes or any such other contest or similar type of promotion ("Promotions") be permitted in connection with the Licensed Products without the advance written approval of WWE. In the event WWE approves such Promotions for Licensee, it is understood that Licensee will be responsible for (i) compliance with all Federal, State and local rules and regulations concerning the Promotions, (ii) implementation and administration of the Promotion including collection of any and all the entries related thereto, the selection of the winners and awarding the prizes; and (iii) the completion of any such other element of the Promotions in order to ensure its fulfillment.

c) <u>Prohibition Against Modifying Licensed Products</u>:   Licensee will not manufacture, sell or distribute the Licensed Products with any party or entity who changes, alters, or adds to the Licensed Products in any manner whatsoever and then resells or distributes the Licensed Products to retailers, wholesalers, vendors or the general public, unless approved in advance in writing by WWE.

B(6)   <u>Compliance.</u>

a) Licensee will manufacture, sell, promote, advertise and distribute the Licensed Product(s) in a legal and ethical manner and in accordance with the terms and intent of this Agreement. To that end, Licensee agrees on behalf of itself, its manufacturers, distributors, agents and/or representatives (collectively referred to throughout the remainder of this subsection B(6) as "Licensee") to adhere to (and ensure compliance by its manufacturers, distributors, agents and/or representatives) the following Code of Conduct:

ETHICAL STANDARDS.  Licensee shall conduct its business in accordance with the highest standards of ethical behavior.

COMPLIANCE WITH APPLICABLE LAWS.  Licensee shall comply with all applicable laws and regulations of the countries, states and localities in which it operates.

EMPLOYMENT PRACTICES.  WWE will only do business with Licensees whose employees are appropriately compensated, present at work voluntarily, not at undue risk of physical harm and not exploited in any way.  In addition, Licensee must comply with the following specific standards:

- Wages and Benefits: Licensee shall provide wages, overtime compensation and benefits at not less than the minimum levels required by applicable laws and regulations or the prevailing local industry levels, if higher.

- Working Hours: Licensee shall, at a minimum, comply with all applicable working hours' laws and regulations.  Except in unusual business circumstances, employees shall not be required to work more than the lesser of (a) 48 hours per week and 12 hours of overtime or (b) the limits on regular and overtime hours allowed by local

16

law or, where local law does not limit the hours of work, the regular work week in such locality plus 12 hours of overtime. In addition, except in unusual business circumstances, employees shall be entitled to at least one day off every seven-day period.

- Child Labor: Licensee shall not employ any person under the age of 15 (or 14 where allowed by local law) or under the local age for completing compulsory education, if higher.

- Forced Labor: Licensee shall not use any forced labor, whether in the form of prison labor, indentured labor, bonded labor or otherwise.

- Harassment or Abuse: Licensee shall treat each employee with dignity and respect, and shall not use corporal punishment, threats of violence or other forms of physical, sexual, psychological or verbal harassment or abuse.

- Non discrimination: Licensee shall not discriminate in employment practices on the basis of race, religion, age, nationality, social or ethnic origin, gender, sexual orientation, political opinion or disability.

- Freedom of Association: Licensee shall recognize and respect the right of employees to join organizations of their own choosing and shall neither threaten nor penalize employees for their efforts to organize or bargain collectively.

- Health and Safety: Licensee shall provide employees with a safe and healthy working environment. Manufacturing facilities shall, at a minimum, contain clean restrooms, potable water, adequate lighting, adequate ventilation and fire exits. Residential facilities, if provided, shall also be kept sanitary and safe.

ENVIRONMENTAL REQUIREMENTS. Licensee shall comply with all applicable environmental laws and regulations.

COMMUNICATION. Licensee shall take appropriate steps to ensure that the provisions of this Code of Conduct are communicated to employees, including the prominent posting of the Code of Conduct (in the local language) in their manufacturing facilities.

MONITORING AND COMPLIANCE. Licensee shall conduct periodic audits of manufacturing facilities, on the basis of which they shall certify to WWE on request either that (a) all products and services furnished to WWE have been furnished in compliance with this Code of Conduct, or (b) identified facilities have been found not to be in compliance with this Code of Conduct, in which event the Licensee shall specify appropriate and effective steps to remedy the non-compliance. WWE or its representatives are authorized to engage in monitoring activities to confirm compliance with this Code of Conduct, including on-site inspections of manufacturing facilities and residential facilities, audits of records relating to employment matters and private interviews with employees at all levels. Licensee shall retain and make available to WWE or its representatives, either on site or at agreed upon locations, all

17

documentation that may be required to assess whether or not the Licensee is in compliance with this Code of Conduct.

FAILURE TO COMPLY. WWE reserves the right, in addition to all other legal and contractual rights, to terminate its relationship with any Licensee found to be in violation of this Code of Conduct.

b) Licensee will furthermore at all times conduct all aspects of its business in a fair and reasonable manner and in compliance with all shipment tracking, identification and anti-counterfeiting systems and labels (see Paragraph 9) that WWE may establish from time to time and all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry. Licensee will use its commercially reasonable efforts to ensure that all channels of distribution purchasing Licensed Products comply with the current WWE anti-counterfeiting systems and labels established and as from time to time thereafter amended by WWE.

c) It will be Licensee's sole responsibility, at its sole expense, to obtain all approvals (including approvals of certain Licensed Products and/or Advertising Materials) of all governmental authorities which may be necessary in connection with Licensee's performance under this Agreement.

d) Licensee acknowledges and fully understands the following meanings established for "Counterfeit Goods", "Diverted Goods" and "Parallel Goods":

- "Counterfeit Goods" shall mean and include by way of example and not limitation (i) any goods, material, product or otherwise that bear any Intellectual Property that has been reproduced and/or affixed thereto without authorization from WWE; (ii) goods that bear any Intellectual Property produced for any source in excess of the amount ordered by WWE licensee or designated customer or distributor; and (iii) any goods that bear any Intellectual Property, hereto that has been rejected by or never approved by WWE and nevertheless entered into the stream of commerce.

- "Diverted Goods" shall mean and include any goods produced by someone acting on behalf of Licensee, wherein such goods are not delivered by the producer to Licensee or to a person designated by such Licensee to receive such goods.

- "Parallel Goods" shall mean and include Licensed Products transferred outside of the Territory or brought into the Territory in violation of this Agreement.

If permitted by applicable law Licensee will use all commercially reasonable means to prevent the recreation of any Counterfeit Goods, Diverted Goods, and/or Parallel Goods involving Intellectual Property by its employees, agents, representatives or any others operating under its direction, supervision or control. If permitted by applicable law and if Licensee actually knows (or had a reasonable basis to suspect) that any Licensed Product sold by Licensee is being resold outside the Territory (i.e. Counterfeit Goods, Diverted Good and/or Parallel Goods), Licensee will compensate WWE for the injury to its licensing and distribution program and will pay all costs and expenses, including attorney's fees, required to remove such goods from the

18

marketplace and/or permanently restrain Licensee's customer from further unauthorized sale of Licensed Product. Any such monetary damages will be in addition to, and not in lieu of, such other rights and relief (including injunctive relief) as may be available to WWE. Licensee will incorporate within its contracts of sale or sales orders a provision similar in substance to the terms of this Section and which provides that the obligations set forth in this Section will be a continuing obligation on the re-sale of the Licensed Products to subsequent authorized wholesale purchases and which makes WWE a third party beneficiary of such provisions.

### SECTION C.    ROYALTY STATEMENTS AND PAYMENTS

C(1)    Computation of Royalties. All royalties due WWE shall accrue upon the sale of the Licensed Products, regardless of the time of collection by the Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" as of the date on which such Licensed Product is billed, invoiced, shipped, processed or paid for, whichever event occurs first. If any Licensed Products are consigned to a distributor by the Licensee, the Licensed Products shall be considered "sold" by the Licensee upon the date on which such distributor bills, invoices, ships, processes or receives payment for any of the Licensed Products, whichever occurs first.

C(2)    Time of Payment. All royalty payments shall be made in accordance with the mandatory payment schedule set forth in Paragraph 4 of this Agreement and/or as otherwise directed in Section C(5) below. All royalty amounts in this Agreement are stated in US Dollars and all royalty payments shall be made in US Dollars. All royalty statements required to be submitted by the Licensee shall accompany the royalty payments made to WWE.

C(3)    Deductions; Taxes.

a) There shall be no deduction from the royalties owed to WWE for uncollectible accounts or for taxes (such as value added taxes or goods and services taxes), and for fees, assessments, quotas, licenses, contingents, commissions, import or export taxes, import or export permits, similar levies, fees or charges imposed or levied or any other expenses of any kind which may be incurred or paid by WWE or the Licensee in connection with: (i) royalty payments to WWE; (ii) the manufacture, sale, distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars (if applicable). It shall be the Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

b) Notwithstanding the provisions of the preceding Section C(3)(a), if (i) any country imposes a withholding tax against WWE, as licensor, with respect to the royalties payable to WWE by the Licensee on sales of the Licensed Products in such country, (ii) such tax is paid by the Licensee on behalf of WWE, and (iii) such tax is an income tax as to which a foreign tax credit is allowable to WWE under Section 901 of the Internal Revenue Code of 1986, as amended, the Licensee may deduct the amount of such withholding tax from the royalties owing to WWE on the condition that the Licensee furnishes to WWE such information and

19

documentation as WWE requires to evidence WWE's right to credit such withholding tax against its federal income tax liability in the United States.

C(4)    Royalty Statements. Licensee shall furnish to WWE in the form attached hereto as Schedule A in an Excel format via e-mail or regular mail within fifteen (15) days after the close of each and every calendar quarter during the Term hereof, as defined in Paragraph 4 above, along with any royalty payments then due, if any, full, complete and accurate statements, duly certified by an officer of the Licensee to be true and accurate, showing the number of each type of Licensed Product sold during the calendar quarter in question, the total gross sales revenues for each such Licensed Product, an itemization of all allowable deductions taken pursuant to the definition of Net Sales, if any, the Net Sales for each Licensed Product sold, the amount of royalties due with respect to such sales, the quantities of each Licensed Product on hand and in transit as of the end of such quarter, the SKU and/or UPC code for each Licensed Product and all information necessary for the calculation of the Net Sales together with such other pertinent information as WWE may reasonably request from time to time. The Licensee's royalty accountings shall identify with specificity the types of Intellectual Property used on or in connection with each Licensed Product sold, including the identities of all Talent appearing on or depicted within each such Licensed Product. There shall be a breakdown of sales of Licensed Products by country, and all figures and monetary amounts shall first be stated in the currency in which the sales were actually made. If several currencies are involved in any reporting category, that category shall be broken down by each such currency. Next to each currency amount shall be the equivalent amount in U.S. Dollars, and the rate of exchange used in making the conversion calculation, which shall be the spot rate for the local currency as published in the Wall Street Journal on the last business day of the preceding month. All payments shall be made in U.S. Dollars.

C(5)    Royalty Adjustments.  The receipt or acceptance by WWE of any royalty statements furnished pursuant to this Agreement or the receipt or acceptance of any royalty payments made, shall not preclude WWE from questioning their accuracy at any time.  If any inconsistencies or mistakes are discovered in such statements or payments, appropriate adjustments shall be made immediately by the parties. The Licensee shall pay WWE interest on a late royalty payment at one and one-half percent (1 ½%) per month or eighteen percent (18%) per annum.

C(6)    Method of Payment.  Simultaneous with the submission of each and every royalty statement due during the Term of this Agreement, Licensee will make payment of any and all royalties then due, as required by Paragraph 4 of this Agreement, by electronic transfer to World Wrestling Entertainment, Inc. in accordance with the following instructions (or such other wire transfer information as WWE shall provide):

> Bank Name:    JP Morgan Chase
> Bank Address: 270 Park Avenue
>               41st Floor
>               New York, NY  10017

20

ABA # 021000021
Swift Code: CHASUS33
IBAN # 01021000021323415660
Customer Name: World Wrestling Entertainment, Inc.
Account # 323-415660

## SECTION D.    BOOKS OF ACCOUNT AND OTHER RECORDS; AUDITS

D(1)    Retention of Records.  While this Agreement remains in effect and for two years thereafter, the Licensee shall keep full and accurate books of account and copies of all documents and other material relating to this Agreement at the Licensee's principal office. WWE, by its duly authorized agents and representatives, shall have the right to audit such books, documents, and other material, shall have access thereto during ordinary business hours, and shall be at liberty to make copies of such books, documents, and other material.  At WWE's request, the Licensee shall provide an authorized employee to assist in the examination of the Licensee's records.  The breach of any aspect of this section shall be a material breach and is cause for immediate termination of this Agreement.

D(2)    Audits by WWE.  If any audit of the Licensee's books and records reveals that the Licensee has failed properly to account for and pay royalties owing to WWE, and the amount of any royalties which the Licensee has failed properly to account for and pay for any quarterly accounting period exceeds, by five percent (5%) or more, the royalties actually accounted for and paid to WWE for such period, then Licensee shall, in addition to paying WWE such past due royalties, reimburse WWE for its direct out-of-pocket expenses incurred in conducting such audit, together with interest on the overdue royalty amount at one and one-half percent (1 ½%) per month or eighteen percent (18%) per annum on which such overdue royalty amount should have been paid to WWE. Additionally, at its option, WWE shall have the right to terminate this Agreement immediately.

D(3)    Rights Reserved by WWE.  The exercise by WWE, in whole or in part or at any time or times, of the right to audit records and accounts or of any other right herein granted under Section D, the acceptance by WWE of any statement or statements or the receipt and deposit by WWE of any payments tendered by or on behalf of Licensee shall be without prejudice to any rights or remedies of WWE, whether at law, equity or otherwise, and WWE shall not be stopped or prevented from thereafter disputing the accuracy of any such statement or payment.

## SECTION E.    TRADEMARK PROTECTION

E(1)    Trademark Uses Inure to WWE's Benefit.  Licensee recognizes the exclusive right of WWE to all Intellectual Property and any translations thereof and will not use such Intellectual Property or any such translations in any manner or for any reason except as expressly contemplated by this Agreement.  All uses of the Intellectual Property and any translations thereof by Licensee will inure to the exclusive benefit of WWE, which will own all rights, including trademark rights, created by such uses of the Intellectual Property and/or translations, together with the goodwill of the business in connection with which such trademarks are used.

21

E(2)    Trademark Registrations.    WWE will have the exclusive right, but not the obligation, to file at its own expense trademark applications relating to the use or proposed use by Licensee of any of the Intellectual Property and any translations in connection with the Licensed Products.  Any and all such filings will be made in the name of WWE or its designee. Licensee will execute all documents and perform such other acts as WWE may deem necessary to secure, perfect, or record WWE's or its designee's trademark rights.  Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's trademarks, trademark applications, and/or trademark registrations or (b) challenge WWE's ownership of and/or the validity of WWE's trademarks, trademark applications, and/or trademark registrations.  The provisions of Section E(2) will survive any termination or expiration of this Agreement.

E(3)    Records Relative to Trademark Uses.  Licensee will keep appropriate records (including copies of pertinent invoices and correspondence) relating to the dates each of the Licensed Products is first placed on sale or sold in each country of the Territory and the dates of first use in each country of each different element of the Intellectual Property and any translations on the Licensed Products and Advertising Materials.  If requested to do so by WWE, Licensee, at Licensee's cost will supply WWE with samples of the trademark usage in question and other information which will enable WWE to complete and obtain trademark applications or registrations, or to evaluate or oppose any trademark applications, registrations, or uses of other parties.   The provisions of Section E(3) will survive any termination or expiration of this Agreement.

E(4)    Registered User Laws.  As to those countries which require applicants to register Licensee as a registered user of a Trademark or other element of the Intellectual Property or any translations used on or in connection with the Licensed Products or which require the recordation of this Agreement, Licensee will execute and deliver to WWE such documents as may be necessary and as are furnished by WWE for such purposes.  Failure to do so will be considered a material breach of this Agreement.

E(5)    Trademark Notices.  Licensee will affix or cause its authorized manufacturing sources to affix to the Licensed Products, the Advertising Materials and any other materials containing the Intellectual Property trademark notices in the name of WWE as provided by WWE in each instance or as follows: the names of all World Wrestling Entertainment televised and live programming, talent names, images, likenesses, slogans and wrestling moves and all World Wrestling Entertainment logos are trademarks which are the exclusive property of World Wrestling Entertainment, Inc.  All other trademarks are the property of their respective owners.

SECTION F.    COPYRIGHT PROVISIONS

F(1)    Copyright Notices.  The authorization by WWE to Licensee to make public distribution of the Licensed Products and Advertising Materials is expressly conditioned upon the following agreement of Licensee: Licensee will place on all Licensed Products, on all Advertising Materials and on any other materials containing the Intellectual Property the copyright notice or notices in the name of WWE as follows: "©20xx World Wrestling Entertainment, Inc. All Rights Reserved"; or as otherwise directed in writing by WWE.

22

F(2)   Design Work.   Licensee acknowledges that all designs of the Licensed Product, including drawings, artwork, sketches, layouts, patterns and material compositions, employed or developed for the production (through CAD/CAM or otherwise) of the Licensed Products, and the codification, recording and reproduction, thereof, however maintained, organized, or derived therefrom including any computer tapes, hard copy of machine readable copies (collectively, the "Specs") are created and developed for the sole benefit of WWE and any and all proprietary interests and ownership rights related thereto including but not limited to copyright belong exclusively to WWE.

F(3)   Work For Hire.   In order to induce the WWE to enter into this Agreement, Licensee acknowledges that all material created under this Agreement (the "Work") was specifically ordered or commissioned by the WWE; that the Work constitutes and will constitute a work-made-for-hire as defined in the United States Copyright Act of 1976; that WWE is and will be the author of the Work and the owner of all rights in and to the Work throughout the universe, in perpetuity, in all languages, for all now known or hereafter existing uses, media and forms, including the copyrights therein and thereto throughout the universe for the initial term and any and all extensions and renewals thereof; and that the WWE will have the right to make such changes therein and such uses thereof as it may deem necessary or desirable. The term "Work" will include any and all material and information created by Licensee in the course of or as a result of the terms and conditions of this Agreement that are fixed in a tangible medium of expression, including without limitation the Specs, Licensed Products, Advertising Materials, translations, composit works, notes, drawings, memoranda, correspondence, documents, records, notebooks, flow charts, computer programs, source and object codes, and derivative works, regardless of the medium in which they are fixed.

F(4)   Assignment by Licensee.   In addition to Section F(3), and to the extent that the Work is not recognized as a "work-made-for-hire," Licensee hereby sells, assigns, and transfers to WWE its entire, worldwide right, title and interest in perpetuity in and to the Work. If parties who are not employees of Licensee (or who are employees of Licensee acting outside the scope of their employment) make or have made any contribution to the creation of the Work so that such parties might be deemed to be "authors" of such Work as the term "author" is used under present or future United States copyright law, or other such applicable laws, then Licensee will obtain from such parties a full assignment of rights so that the foregoing assignment by Licensee vests in WWE full and absolute right and title in the Work free of any claims, interests, or rights of other parties. Licensee will not permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of any such Work. At WWE's request, Licensee will furnish WWE with any and all information concerning the creation of any Work and with any and all copies of the assignments of rights obtained from the foregoing parties.

F(5)   Copyright Registrations.   WWE will have the exclusive right, but not the obligation, to file at its own expense copyright applications for the Work. Any and all such filings will be made in the name of WWE. Licensee will execute all documents and to perform such other acts as WWE may deem necessary to secure, perfect, or record WWE's or its designee's copyrights. Licensee and/or its employees, agents, contractors, and representatives will not (a) oppose, petition to cancel, or otherwise contest WWE's copyright, copyright applications, and/or copyright registrations or (b) challenge WWE's ownership of and/or the

23

validity of WWE's copyrights, copyright applications, and/or copyright registrations. The provisions of Section F(5) will survive any termination or expiration of this Agreement.

F(6)   Waiver of Moral Rights.   Licensee waives any and all of its moral rights, including but not limited to rights of attribution, paternity, and integrity, arising under any federal or state law of the United States or any law of any other region, country, or subdivision thereof in and to the Work, and any contribution thereto, for any and all past, present, or future uses or purposes now known or hereafter discovered, including without limitation the right to modify said work, ("Moral Rights") in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.   If other parties, including but not limited to Licensee's employees, agents, and subcontractors, have made any contribution to the creation of the Work so that such parties might be deemed to have Moral Rights under present or future United States law or any law of any other region, country, or subdivision thereof, then Licensee will obtain from such parties a full waiver of any and all of his or her Moral Rights in favor of WWE and its predecessors, successors, assigns and licensees or sub-licensees.

F(7)   Enforcement.   Licensee warrants that the covenants contained in this Agreement are reasonable, that valid considerations have been and will be received therefore and that the terms set forth in this Agreement are the result of arms-length negotiations between the parties to this Agreement. Licensee recognizes that the provisions of this Section F are vitally important to the continuing welfare of the WWE its members and affiliates and that money damages constitute a totally inadequate remedy for any violation thereof. Accordingly, in the event of any such violation by Licensee, the WWE, its members and affiliates, in addition to any other remedies they may have available to it pursuant to this Agreement or any other agreement, or whether at law or in equity, will have the right to compel specific performance and/or enjoin any action by Licensee in violation of this Section F without necessity for WWE to post a bond or such other security.

SECTION G.   REPRESENTATIONS AND WARRANTIES

G(1)   WWE's Representation and Warranty.   WWE hereby represents and warrants that it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated; that it has the full right, power, legal capacity and authority to enter into this Agreement, to carry out the terms hereof and to grant Licensee the rights and privileges granted hereunder. WWE also represents and warrants that WWE has the right to license the exploitation rights granted in this Agreement and that the rights granted herein will not violate or infringe upon the rights of any third persons and/or parties.

G(2)   Licensee's Covenants, Warranty and Representation.

a) Licensee hereby covenants, represents and warrants that it is a corporation duly incorporated, validly existing and in good standing of the laws of the jurisdiction in which it was incorporated; that it has full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof. Licensee further covenants, represents, and warrants that, with the exception of WWE's Intellectual Property, it owns or has the rights to any and all designs, products, artwork, photographs and intellectual property Licensee uses to manufacture the Licensed Product. It is understood and agreed that during the Term of this

24

Agreement, Licensee and WWE, either individually or collectively may be considered the promoter and advertiser of the Licensed Products. In those circumstances, Licensee acknowledges and agrees that on behalf of itself and on behalf of WWE it shall comply with all federal, state and local laws, rules, regulations and industry standards concerning the manufacture, promotion and advertisement of the Licensed Products and Licensee furthermore agrees not to engage in any unconscionable commercial practice, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression of omission of any material fact in the manufacture, advertising or promotion of the Licensed Products ("Product Compliance"). To that end, in addition to the indemnification provisions set forth throughout this Agreement, Licensee agrees to fully indemnify, defend and hold WWE harmless from any and all claims, damages or injuries relating to, in connection with or arising out of Product Compliance for the Licensed Products.

b) Licensee hereby covenants, warrants and represents that it has legally obtained all necessary rights to manufacture, distribute and sell, as Licensed Products, pursuant to the terms of this Agreement, the Winged Belt, Inter-Continental Belt, 1986 Heavyweight Belt, WCW Classic Heavyweight Belt, WCW Classic Tag Team Belt, 1987 Heavyweight Belt and AWA Championship Belt (collectively the "Reggie Parks Replica Belts"), the rights for which are owned by Reggie Parks

c) Licensee hereby agrees that its covenants, representations, warranties and agreements are of the essence to this Agreement and shall survive the expiration of the Term.

SECTION H.    INDEMNIFICATION; PRODUCT LIABILITY INSURANCE

H(1)    Licensee's Indemnification.    Licensee will be solely responsible for and will indemnify, defend and hold WWE and its licensees, successors and assigns, parent corporations, member corporations, subsidiaries and affiliates and its and their respective officers, directors, members, employees, advertisers, insurers, and representatives (collectively referred to as "Indemnified Parties") harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees (including an appropriate allocation for in-house counsel and paralegal fees) arising from or by reason of or in connection with the manufacture, distribution, advertising, promotion, offering for sale and sale of the Licensed Products which includes any claims or suits against the Indemnified Parties by reason of: (i) any unauthorized use, infringement or alleged infringement of any trademark, service mark, copyright, patent, process, method or device owned or controlled by a third party and exploited by Licensee in connection with the Licensed Products, the Advertising Materials and/or this Agreement; (ii) any defects, alleged defects and/or deficiencies (whether obvious or hidden and whether or not present in any sample approved by WWE) in said Licensed Products or the use thereof, or for any false advertising, fraud or misrepresentations or other claims related to the Licensed Products and/or the Advertising Materials (not involving a claim of right to the Intellectual Property) or in any packaging or other materials relating to the Licensed Products (including Advertising Materials); (iii) any claim that the use of any design or other graphic component of any Licensed Product (other than the Intellectual Property) violates or infringes upon the trademark, copyright or other intellectual property rights (including trade dress) of a third party; (iv) any unauthorized uses of the Licensed Products or Advertising

25

Materials by Licensee; (v) any libel or slander against, or invasion of the right of privacy, publicity or property of, or in violation or misappropriation of any other right of any third party as it relates in any manner whatsoever to the exploitation of Licensee's rights under this Agreement; (vi) any agreements or alleged agreements, whether written or oral, made or entered into by or with Licensee to effectuate the terms of this Agreement, including any employment or consulting agreements entered into by Licensee related in any manner to the exploitation of this Agreement and any such other agreements entered into by Licensee that relates to the manufacture, distribution, exploitation, advertising, sale or use of the Licensed Products by Licensee, its agents and/or representatives; (vii) any Promotions or contests conducted by Licensee related to this Agreement; (viii) any breach or alleged breach of the terms, representations and warranties under this Agreement by Licensee, its subsidiaries, manufacturers, distributors, advertisers or other persons, employees or agents of any of the foregoing; (ix) any act concerning the unconscionable commercial practice, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression of omission of any material fact in the advertising or promotion of the Licensed Products; (x) any act or omission arising out of or related in any manner to this Agreement and/or (xi) any other act under or in violation of this Agreement by Licensee, its subsidiaries, manufacturers, distributors, advertisers or other persons, employees or agents of any of the foregoing.

    H(2)    WWE's Indemnification. To the extent that the Intellectual Property has not been altered, changed or modified in any way, WWE agrees to indemnify and hold the Licensee harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fee (but excluding lost profits or consequential damages) made by third parties against the Licensee based solely on a claim of right in one or more elements of the Intellectual Property.

    H(3)    Claims Procedures. With respect to any claims falling within the scope of the foregoing indemnifications: (a) each party agrees promptly to notify in writing the other party of, and to keep the other party fully advised with respect to, such claims and the progress of any suits in which the other party is not participating; (b) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (c) each party shall have the right to participate, at its sole expense, in any suit instituted against it and/or to approve any attorneys selected by the other party to defend it, which approval shall not be unreasonably withheld or delayed; and (d) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

    H(4)    Insurance. The Licensee agrees to obtain and maintain during the Term of this Agreement, at its own expense, a comprehensive general liability insurance policy which shall include coverage for product liability and advertising related claims from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is acceptable to WWE providing protection (at a minimum, in the amount of Two Million US Dollars ($2,000,000.00 USD) per occurrence, Four Million US Dollars ($4,000,000.00 USD) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses, including but not limited to attorneys' fees including an appropriate allocation for in-house counsel fees, arising out of or caused in connection with any defects, alleged defects or deficiencies in the Licensed

26

Products. The insurance policy shall furthermore contain an endorsement that provides insurance coverage for any advertising injury arising out of (i) the misappropriation of advertising ideas; (ii) the failure of the Licensed Products to conform with the advertised quality or performance thereof and/or; (iii) the wrong description of the price of the Licensed Products. Such insurance shall also include coverage of WWE, its directors, officers, shareholders, employees, agents, licensees, insurers, advertisers, assignees, and successors. Such insurance shall remain in full force and effect at all times during the Term and for a period of two (2) years thereafter. Within thirty (30) days after execution of this Agreement by WWE and again within thirty (30) days of the policy's renewal date, the Licensee shall cause the insurance company issuing such policy to issue a duplicate original certificate to WWE naming WWE as an additional insured together with evidence of payment in full for the policy, confirming that such policy has been issued and is in full force and effect and provides coverage for WWE as required by this Section H(4). Said insurance policy shall also contain an endorsement that the insurance coverage shall not be reduced, modified or cancelled without Licensee and the insurance company providing thirty (30) days prior written notice to WWE. In the event that the Licensee's product liability and advertising claims insurance coverage lapses, or if at any time WWE is not covered by insurance in accordance with provisions set forth herein, or if any other provision of this section is breached, WWE shall have the right to immediately terminate this Agreement.

### SECTION I.   RESERVATION OF RIGHTS

Except as provided for under Paragraph 2 of this Agreement, all rights in and to the Intellectual Property (including any premium rights related to the Licensed Products) are retained by WWE for its own use and exploitation (including the right to license said rights or portion thereof to third parties for their exploitation). Licensee shall not acquire any rights whatsoever in the Intellectual Property as a result of its use hereunder and all use of the Intellectual Property will inure to WWE's benefit. For the purpose of absolute certainty, it is understood and agreed that WWE reserves the right to use, and to license other parties to use, the Intellectual Property within the Territory for any purpose WWE may determine in its sole discretion.

### SECTION J.   INFRINGEMENTS; CLAIMS

J(1)   <u>Representations and Warranties by Licensee</u>. Licensee represents and warrants to WWE that all designs and products submitted for approval (other than the Intellectual Property) are not subject to any valid patent, copyright, trademark or other proprietary rights of any third party. It is understood and agreed that WWE shall not be liable (and Licensee shall fully indemnify and hold WWE harmless therefrom) for any activities of Licensee under this Agreement that may infringe or alleged to infringe any patent, copyright, trademark or other proprietary rights belonging to any third party, or for damages or costs involved in any proceeding based upon such infringement or alleged infringement, or for any royalty or obligation incurred by Licensee because of any patent, copyright, trademark or other proprietary interest held by a third party, other than claims based solely upon a right to or in one or more elements of the Intellectual Property.

J(2)   <u>Infringements</u>. When the Licensee learns that a party is making unauthorized uses of the Intellectual Property, the Licensee agrees to promptly give WWE written notice

containing full and complete information with respect to the actions of such party. The Licensee agrees not to make any demands or claims, bring suit, effect any settlements, or take any other action against such party without the prior written consent of WWE. The Licensee agrees to cooperate with WWE, in connection with any action taken by WWE to terminate infringements.

J(3)    Claims.   If claims or suits are made against WWE or the Licensee by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Intellectual Property, and asserting further that the use of a particular element of the Intellectual Property by the Licensee infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Intellectual Property by the Licensee, WWE and the Licensee agrees in any such case to consult with each other on a suitable course of action. In no event shall the Licensee have the right, without the prior written consent of WWE, to acknowledge the validity of the claim of such party, to obtain or seek a license from such party, or to take any other action which might impair the ability of WWE to contest the claim of such party if WWE so elects. The Licensee agrees at the request of WWE to make any and all reasonable modifications requested by WWE in the Licensee's use of the element of the Intellectual Property in question or to discontinue use of such element in the country of the territory in question on the particular Licensed Product or Licensed Products which are involved, if WWE, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the threat of a claim or suit by such party. WWE shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the Licensee with respect to the use by the Licensee of an element of the Intellectual Property.

### SECTION K.    NO   SUBLICENSING   OF   RIGHTS;   AGREEMENTS   WITH MANUFACTURERS

K(1)    Sublicensing.  The Licensee shall not have the right to sublicense any of the rights granted to it under this Agreement.

K(2)    Agreements with Manufacturers.  For purposes of this Agreement, Licensee is the manufacturer of the Licensed Products. With the prior written approval of WWE, Licensee may arrange with another party to manufacture the Licensed Products or components of the Licensed Products for exclusive sale, use and distribution by the Licensee. In that instance, Licensee agrees to enter into a written agreement with all such manufacturers, and agrees to incorporate into such written agreements all of the provisions, for the protection of the rights of WWE. Licensee further agrees to furnish WWE, within thirty (30) days of their execution, copies of all agreements with such manufacturers. The failure to comply with any aspect of this section is a material breach and WWE shall have the right to immediately terminate this Agreement.

K(3)    Enforcement of Manufacturer Agreements.   The Licensee agrees strictly to enforce against its manufacturers all of the provisions which are required to be included in such agreements for the protection of WWE, as provided in Section K(2), to advise WWE of any violations thereof by manufacturers, and of corrective actions taken by the Licensee and the results thereof; and at the request of WWE to terminate such an agreement with any

G:\Department\Legal Affairs\Consumer Products License\Licensee Agreements\Figures Toy Company\2009\Figures Toy Co License Agreement 2009 FINAL 07-09-09 (jgc).doc

manufacturer which violates any such provisions; all for the protection of WWE. If the Licensee fails to exercise such termination rights by giving written notice to the manufacturer within twenty (20) days after being requested to do so in writing by WWE, the Licensee appoints WWE its irrevocable attorney-in-fact to send a notice of termination in the name of the Licensee to the manufacturer for the purpose of terminating the agreement or any specific rights of the party under such agreement.

SECTION L.    BREACH AND TERMINATION

L(1)    Right Of Termination.

a) Immediate Right of Termination.  In addition to the termination rights stated elsewhere in this Agreement, WWE will have the right to terminate this Agreement immediately by giving written notice to Licensee, in any of the following situations:

i)    If Licensee has failed to comply with any requirement of the approval process for Licensed Products described in Section A(2)(b) above;

ii)    If three (3) months after the Effective Date of this Agreement by WWE, Licensee failed to take good faith steps to exploit the rights granted to it, including the creation of prototypes of each item of the Licensed Products and seeking to obtain WWE's approval of same, or if six (6) months after the Effective Date of this Agreement by WWE, Licensee has not begun to distribute the Licensed Product;

iii)    If Licensee makes, sells, offers for sale, or distributes or uses any Licensed Product or Advertising Material without having the prior written approval of WWE, as required by Section A, or makes any use of the Intellectual Property, if applicable, not authorized under this Agreement at any time thereafter;

iv)    If Licensee fails to deliver to WWE or to maintain in full force and effect the insurance referenced to in Section H of this Agreement;

v)    If Licensee ceases to do business as it is now conducted;

vi)    If Licensee fails to deliver any statements or notices referred to in this Agreement or to give access to the premises and/or licensing records pursuant to the provisions of this Agreement to WWE or WWE's authorized representatives for the purposes permitted under this Agreement;

vii)    If Licensee exhibits a pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products to its customers or retailers that results: (1) in the inability of retailers to meet consumer demand and materially affects the generation of royalties payable to WWE, and/or (2) in an adverse effect to the WWE licensing program; provided, however, that this clause will not be applicable to a failure to make timely delivery that results from a force majeure event or an unexpected, unplanned demand, so long as all reasonable efforts are made by Licensee to resume timely delivery as soon as possible;

29

viii) If Licensee knowingly (1) delivers Licensed Products outside the Territory; (2) sells Licensed Products to a third party who Licensee knows delivers or sells the Licensed Products outside the Territory; (3) sells Licensed Products to a third party who Licensee had good and sufficient reason to know delivers the Licensed Products outside the Territory (and provided Licensee does not promptly cease delivery to such third party after it should have reasonably ascertained such party's intent, or after receiving notice of such party's transshipping); or (4) Licensee improperly distributes the Licensed Products to retailers or distributors outside of the scope of this Agreement as set forth in Paragraph 2;

ix)   If Licensee sells to any third party that Licensee knows, or has reason to know, is altering or modifying the Licensed Products prior to sale to the ultimate customer;

x)   If any governmental agency or court of competent jurisdiction finds that the Licensed Product(s) are defective in any way, manner or form, including being the subject to any voluntary or involuntary order of any governmental agency (e.g., U.S. Consumer Product Safety Commission) involving the recall of any of the Licensed Products because of safety, health or other hazards or risks to the public;

xi)   If, other than under Title 11 of the United States Code, Licensee becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings, or an assignment for the benefit of creditors is made by Licensee, or an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt, or a receiver is appointed to administer the assets of Licensee, or the assets of Licensee are liquidated, or any distress, execution, or attachment is levied on such of its manufacturing or other equipment as is used in the production and distribution of the Licensed Products and remains undischarged for a period of thirty (30) days;

xii)   If Licensee discloses any Confidential Information concerning this Agreement, as defined in Section N(15), which, it acknowledges, it may become privy to during the Term of this Agreement; and

xiii)   If Licensee fails to comply with Sections 7 or 9 of this Agreement.

b)   <u>Right to Terminate upon Ten (10) Days Written Notice (one time curable breach only)</u>.  If Licensee fails to make any Minimum Guarantee payment, Royalty Payment, payment for photographs, artwork, video footage, music or sound bytes or any payment by the date such payment is required under the provisions of Paragraphs 4 and 5 and/or Section C or if Licensee fails to submit royalty statements and/or any other statements to WWE during the time periods specified in Paragraph 4 and/or Section C and Licensee fails to cure the breach within ten (10) days after receipt of a default notice from WWE, provided however that Licensee will not have the right to cure any subsequent late or overdue royalty payment and/or royalty statement failures under this Section (after the first violation, all subsequent breaches under this Agreement by Licensee shall allow WWE the right to immediately terminate the Agreement).

c)   <u>Right to Terminate upon Thirty (30) Days Written Notice (curable breach)</u>.  If Licensee breaches any other terms and provisions of this Agreement including any representation, warranty, or agreement made by it under this Agreement, other than those

30

specifically itemized in Sections L(1)(a) or L(1)(b), and Licensee fails to cure the breach within thirty (30) days after receiving written notice by registered, express or certified mail from WWE specifying the particulars of the breach, then WWE will have the right to terminate this Agreement immediately, as of the thirty first (31) day, in the form of written notice to Licensee by registered, express or certified mail.

L(2)    Assumption and Rejection Pursuant to United States Bankruptcy Code.  After any order for relief under the Bankruptcy Code is entered against the Licensee, the Licensee must assume or reject this Agreement within sixty (60) days after the order for relief is entered.  If the Licensee does not assume this Agreement within such sixty (60) day period, WWE may, at its sole option, terminate this Agreement immediately by giving written notice to the Licensee, without further liability on the part of WWE.

L(3)    Effect of Termination.  Termination of this Agreement under the provisions of this Section L or the provisions set forth elsewhere in this Agreement shall be without prejudice to any rights or claims which WWE may otherwise have against the Licensee.  Upon the termination of this Agreement for any reason whatsoever, it is understood and agreed that the following events shall occur immediately: (a) all royalties on sales made by Licensee previous to the date of termination shall become immediately due and payable to WWE and (b) all Minimum Guarantees (as set forth in Paragraph 4) outstanding on the date of termination and not yet paid WWE by Licensee hereunder shall become immediately due and payable to WWE.  Upon termination of this Agreement under the provisions of Section L(1)(a)(xi) or L(2) of this Agreement, the Licensee, its receivers, trustees, successors, assignees, or other representatives shall have no right whatsoever to sell, exploit, or in any way deal with the Licensed Products, the Advertising Materials, or the Intellectual Property, except with the special written consent and instructions of WWE.

L(4)    Discontinuance of Use of Intellectual Property, etc.  Subject to the provisions of Section L(5), upon the expiration or earlier termination of this Agreement, the Licensee agrees immediately and permanently to discontinue manufacturing, selling, advertising, distributing, and using the Licensed Products and Advertising Materials; immediately and permanently to discontinue using the Intellectual Property; immediately to destroy any films, molds, dies, CD's, electronic data files, patterns, or similar items from which the Licensed Products and Advertising Materials were made, where any element of the Intellectual Property is an integral part thereof; and immediately to terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products.

L(5)    Disposition of Inventory Upon Expiration.  Notwithstanding the provisions of Section L(4), if this Agreement expires in accordance with its terms, and is not terminated for cause by WWE, the provisions of this Section L(5) apply.  If Licensee delivers to WWE on or before thirty (30) days prior to the expiration of this Agreement, a written inventory listing, on a Licensed Product-by-Licensed Product basis, all Licensed Products in the Licensee's possession, custody, or control as of the date of such inventory, Licensee shall have the non-exclusive right to sell any Licensed Products listed on such inventory for a period of sixty (60) days immediately following such expiration, subject to the payment of royalties to WWE on any such sales in accordance with the terms of this Agreement.  WWE shall have the right (but not the obligation)

31

to buy any or all of the Licensed Products listed on such inventory at the Licensee's cost of manufacture. The sell-off right granted Licensee under this Section L(5) shall in no event apply to a quantity of any Licensed Product exceeding fifty percent (50%) of the Licensee's average quarterly unit sales of such Licensed Product during the one (1) year period immediately preceding the expiration of this Agreement. In addition at WWE's request, Licensee shall cease to manufacture all Licensed Product thirty (30) days prior to the expiration of this Agreement. If the Licensee sells-off the remaining inventory, it shall pay WWE a royalty on such sales based upon either the royalty percentage of actual Net Sales of each of the Licensed Products or the average per unit royalty amount paid to WWE for each of the Licensed Products in the previous four (4) Quarters, whichever is greater.

L(6)   Equitable Relief.   Licensee acknowledges that WWE is entering into this Agreement not only in consideration of the royalties paid, but also for the promotional value, goodwill and intrinsic benefit resulting from the manufacture, advertisement, distribution, sale and promotion of the Licensed Products by Licensee within the Territory. Licensee further acknowledges that the Intellectual Property, possesses a special, unique and extraordinary character that cannot be replaced or the loss thereof adequately compensated for in money damages and that any breach by Licensee of this Agreement will cause irreparable injury and harm to the WWE. Therefore, if it is alleged by the WWE or any third party affiliated with the WWE that (i) Licensee has failed to manufacture, advertise, distribute, market, promote and/or sell the Licensed Products in strict accordance with the terms of this Agreement and/or (ii) Licensee has used the Intellectual Property in an unauthorized manner, as WWE will determine in its sole discretion, then, in each such case, WWE, any third party affiliated with the WWE and/or their assignees (in addition to any other remedies that may be available to them under this Agreement, at law or in equity or pursuant to such other applicable laws) will have the right to obtain from any court having jurisdiction such equitable relief as may be appropriate, including such necessary injunctive relief, without the necessity of posting a bond or other security or proving actual damages. In any suit, action or proceeding brought to obtain such relief, Licensee waives it right, if any, to trial by jury, and, to the maximum extent permitted by applicable law, waive its rights, if any, to interpose any counterclaim or set-off for any cause whatsoever.

SECTION M.   DISPOSAL OF SECONDS

If, during the manufacture of the Licensed Products, any seconds (the "Seconds") are produced, Licensee will destroy such Seconds and will send WWE an affidavit attesting to the destruction. The provisions of this Section will not apply to any Seconds from which all references to the Licensed Marks are completely and permanently obliterated, which Seconds shall be disposed of as Licensee elects in its sole discretion.

SECTION N.   MISCELLANEOUS PROVISIONS

N(1)   Restriction on Assignments. Without the prior written consent of WWE, (which consent may be withheld in WWE's sole discretion) the Licensee shall not, directly or indirectly, assign, sublicense, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement. For example, should Licensee be a corporation, limited partnership, limited liability company, business trust, general partnership or other business entity

32

then a Transfer which requires the consent of WWE as provided in this Section shall include without limitation (i) any assignment, sale, conveyance, transfer, hypothecation, pledge, encumbrance or other transfer of 50% or more of stock, shares, limited partnership interests, general partnership interests or other equity ownership interests (as appropriate) of Licensee within any consecutive 12 month period, (ii) the sale of all or substantially all of the assets of Licensee, (iii) any merger, consolidation or reorganization into or with the assignor, regardless of whether Licensee is the surviving entity and (iv) any other action or event which would constitute a transfer of the benefits of this Agreement by operation or force of law. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of WWE.

N(2)    Independent Contractor Relationship; Parties Not Joint Venturers.  At all times the parties hereto shall be considered independent contractors and this Agreement shall not create an agency, franchise, partnership or employment relationship between the parties and nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers or to permit the Licensee to bind WWE to any agreement or purport to act on behalf of WWE in any respect.

N(3)    Modifications of Agreement; Remedies.  No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by the respective duly authorized representatives of each of the parties.  Failure by either party to enforce any rights under this Agreement shall not be construed as a continuing waiver or as a waiver in other instances.

N(4)    No Waiver of Termination Rights. The waiver, expressed or implied, by WWE of any rights hereunder or WWE's failure to perform or act upon any provision of this Agreement or WWE's breach hereof, will not constitute or be deemed a waiver of any of WWE's rights hereunder and such rights shall be exercisable when it is deemed appropriate by WWE.

N(5)    Invalidity of Separable Provisions. If any provision or clause of this Agreement, or portion thereof, will be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unforceable in such jurisdiction, the remainder of such provision will not thereby be affected and will be given full effect, without regard to the invalid portion.  It is intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court will reduce or modify the duration, area or matter of such provision, and, in its reduced or modified form, such provision will then be enforceable and will be enforced.

N(6)    Notices.  All notices to be given under this Agreement shall be in writing and shall be delivered either by personal delivery, regular mail, overnight courier, or facsimile (provided that a copy of such notice is also given by mail on the same day) (except as herein otherwise expressly provided) at the respective addresses of the parties as set forth above, unless notification of a change of address is given in writing.  Notice given by regular mail shall be deemed given on the date of mailing thereof and notice given by facsimile shall be deemed given

on the date of confirmation of receipt of such facsimile (provided a copy of such notice is also sent by regular mail).

N(7)   Headings.  The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

N(8)   Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

N(9)   Entire Understanding.  This Agreement constitutes the entire agreement between the parties respecting the subject matter hereof and supersedes any and all prior agreements or understandings between the parties with respect to the subject matter hereof, whether written or oral.

N(10)   Interpretation.  Each party, with the assistance of its respective counsel, has read this agreement and has had an opportunity to negotiate fully the terms of this Agreement. Accordingly, any rule of construction seeking to resolve ambiguities against the drafting party shall not be applicable in the interpretation of this Agreement.

N(11)   No Third Party Beneficiaries. There are no intended third party beneficiaries to this Agreement.

N(12)   Governing Law. The Parties agree that this Agreement is made in Connecticut and all disputes, claims, or legal actions arising directly or indirectly out of this Agreement or relating in any way to the subject matter of this Agreement or the Parties' relationship, whether sounding in contract, tort or otherwise, shall be governed by the laws of the State of Connecticut, exclusive of the Connecticut laws relating to the conflicts of laws.  The Parties agree that the provisions contained in this paragraph shall survive the termination and/or expiration of this Agreement.

N(13)   Forum Selection and Jurisdiction. The Parties agree that the United States District Court for the State of Connecticut and the Superior Court, Judicial District Court of Stamford, Connecticut are the exclusive forums in which a party may bring any dispute, claim or legal action arising directly or indirectly out of this Agreement or in any way related to the subject matter of this Agreement or the Parties relationship, whether sounding in contract, tort or otherwise. This provision to submit all disputes, claims, or legal actions to the Federal or State courts in Connecticut shall be specifically enforceable; each Party knowingly waives personal service of process and venue; and each Party consents to jurisdiction in Connecticut. The Parties agree that the provisions contained in this paragraph shall survive the termination and/or expiration of this Agreement.

N(14)   Disclaimer.

a)      Disclaimer.  WWE disclaims all warranties of any kind, except for the warranties contained in Section G(1) hereof.

34

b)    Limitation of Liability. WWE will not be liable to Licensee for any indirect, incidental, reliance, special or consequential damages (including but not limited to lost profits or revenue or any expense or cost related to or arising out of any inventory or goods on hand or any expense or cost incurred with regard to the research and development of the Licensed Product) arising out of or related to this agreement, however caused and by any theory (including negligence of any kind or degree) and regardless of whether WWE has been advised of the possibility of such damages and whether such damages were foreseeable.

c)    Notwithstanding anything to the contrary herein, Licensee acknowledges and agrees that, in the event Licensee breaches the terms of this Agreement, WWE's available remedies shall not be limited to the non-refundable Minimum Guarantee set forth in Paragraph 4(a) or the Royalty Payments set forth in Paragraph 4(b) and that WWE shall be entitled to a recovery based on any and all remedies available at law and/or equity, including any additional monetary damages related to or caused by the breach by Licensee.

N(15)  Confidential Information.

a)    During the Term of this Agreement, each Party may have access to confidential information of the other Party ("Confidential Information"). Confidential Information for the purposes of this Agreement shall be defined to include, but not be limited to, software (regardless of the stage of development), designs, drawings, specifications, models, technical information, unreleased or undisclosed Intellectual Property, hardware, source codes, object codes, documentation diagrams, flow charts, marketing and development plans, business plans, or records, financial information, market reports, customer lists, talent lists, storylines, scripts, story boards or ideas, employee lists, business manuals, policies and procedures, the terms and conditions of this Agreement, billing information and procedures and all other information; provided such information shall be marked "confidential" or "proprietary". The Parties agree both during the Term and for a period of five (5) years after the expiration or termination of this Agreement for any reason whatsoever to hold each other's Confidential Information in confidence, employing the same degree of care that the Party employs for its own proprietary information. The Parties agree not to make each other's Confidential Information available in any form to any third party or to use each other's Confidential Information for any purposes other than for the implementation or exploitation of this Agreement.

b) Notwithstanding the foregoing, the Parties' obligations of confidentiality shall not include information which:

i) at the time of disclosure was in the public domain;

ii) after such disclosure, becomes generally available to the public other than through any act or omission by the party herein releasing said information; and

iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to the non-disclosing Party in a timely manner in order to afford such Party an opportunity to seek a protective order against such disclosure and the

35

disclosure is strictly limited to the information which the disclosing Party is required or compelled to disclose.

N(16)  Press Releases.  Licensee shall not, without WWE's prior written approval, make any statements to the press or any media service or distribute or circulate any written release, promotional literature, news story, publicity or communications of any kind to another party regarding the subject matter of this Agreement, WWE, its operations and activities.

N(17)  Binding Effect. The parties represent and warrant that the person executing this Agreement has the authority to bind the party on behalf of which he/she is signing.

N(18)  Rules of Construction.  As used in this Agreement, unless the context otherwise requires (i) references to "Sections" are to sections of this Agreement; (ii) all "Exhibits" referred to in this Agreement are to Exhibits attached to this Agreement and are incorporated into this Agreement by reference and made a part of this Agreement; (iii) "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import; (iv) the singular includes the plural, (v) the masculine, feminine and neutral genders include the others; and (vi) headings of the various Sections and subsections are for convenience of reference only and will not be given any effect for purposes of interpreting this Agreement.  Furthermore, unless specifically stated to the contrary in Paragraph 2 of this Agreement, all of the rights and licenses granted to Licensee under this Agreement shall be deemed non-exclusive.

N(19)  Force Majeure.  If either party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations.  As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement. Licensee will however be responsible for the continued payment of all royalties due WWE as set forth in Paragraph 4 above during the force majeure event. Upon the resolution of that force majeure event, Licensee will resume its remaining obligations (i.e. all other obligations other than payment) as set forth in this Agreement and/or proceed as otherwise directed by WWE, in its sole discretion.

## SCHEDULE A

### Sample Royalty Reports

Please refer to the spreadsheet accompanying this document.