**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| FIGURES TOY COMPANY, a Florida Corporation<br><br>Plaintiff,<br><br>v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.,<br>a Delaware Corporation<br><br>Defendant. | Civil Action No. 3:13-cv-01256 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF A**
**PRELIMINARY INJUNCTION**

Plaintiff Figures Toy Company respectfully seeks entry of a preliminary injunction preventing Defendant World Wrestling Entertainment Inc. from treating the Consumer Products License Agreement as terminated, and from taking any steps to interfere with that agreement. Such an injunction would protect the status quo and prevent irreparable harm to Plaintiff's business and goodwill.

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................. 2

      A.     The Parties and The Agreement.......................................................... 2

      B.     Facts Giving Rise to Plaintiff's Claims ............................................. 4

      C.     Spinner Belts ...................................................................................... 6

      D.     Championship Belts ............................................................................ 8

      E.     The Effects of Termination on Plaintiff's Business............................ 10

III.    LEGAL STANDARD ................................................................................... 12

IV.    LEGAL ARGUMENT .................................................................................. 12

      A.     Plaintiff is Likely to Win on the Merits of its Claims........................ 12

            1.     Plaintiff is Likely to Prove That the Agreement was Improperly Terminated ........................................................................ 13

                  a.     Spinner Belts .................................................................... 14

                  b.     Championship Belts .......................................................... 15

            2.     The Balance of Hardships Weighs in Plaintiff's Favor ........................ 20

      B.     Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction ............. 22

V.     NO BOND OR A NOMINAL BOND IS APPROPRIATE ........................... 24

VI.    CONCLUSION............................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*Biediger v. Quinnipiac Univ.*,
    616 F. Supp. 2d 277 (D. Conn. 2009) .......................................................................12, 20

*Blom ASA v. Pictometry Int'l Corp.*,
    757 F. Supp. 2d 238 (W.D.N.Y. 2010) ..................................................................................25

*Doctor's Assocs. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996)....................................................................................................24

*Eastman Kodak Co. v. Collins Ink Corp.*,
    821 F. Supp. 2d 582 (W.D.N.Y. 2011) .........................................................................19, 25

*Golden Krust Patties, Inc. v. Bullock*,
    13-CV-2241, 2013 U.S. Dist. LEXIS 99184 (E.D.N.Y. July 16, 2013)................................25

*Kayser-Roth Corp. v. Fruit of the Loom, Inc.*,
    219 U.S.P.Q. (BNA) 736 (S.D.N.Y. Apr. 20, 1983) ..................................................12, 13, 19

*Marshak v. Thomas*,
    No. CV-98-2550, 1998 U.S. Dist. LEXIS 23644 (E.D.N.Y. June 11, 1998) .........................24

*N. Am. Olive Oil Assoc. v. Kangadis Food Inc.*,
    No. 13 Civ. 868, 2013 U.S. Dist. LEXIS 59557, 2013 WL 1777774 (S.D.N.Y. Apr.
    25, 2013) ...............................................................................................................................25

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F.Supp.2d 305 (S.D.N.Y. 2010)....................................................................................24

*Rell v. Rumsfeld*,
    389 F. Supp. 2d 395 (D. Conn. 2005)...................................................................................12

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*,
    749 F.2d 124 (2d Cir. 1984)......................................................................................... passim

*RxUSA Wholesale, Inc. v. HHS*,
    467 F. Supp. 2d 285 (E.D.N.Y. 2006) .....................................................................20, 22, 23

*Solman Distrib., Inc. v. Brown-Forman Corp.*,
    888 F.2d 170 (1st Cir. 1989).........................................................................................12, 19

*Tri-County Wholesale Distrib., Inc. v. The Wine Group, Inc.*,
    2010 US Dist. LEXIS 92598 (S.D. Ohio, Sept. 2, 2010)............................................. passim

**FEDERAL: STATUTES AND RULES**

28 U.S.C. §§ 2201 and 2202 ........................................................................................................1

Fed. R. Civ. P. 57 .......................................................................................................................1

## MEMORANDUM OF LAW

**I.      INTRODUCTION**

Plaintiff Figures Toy Company ("FTC" or "Plaintiff") brought this action against Defendant World Wrestling Entertainment, Inc. ("WWE" or "Defendant") seeking declaratory relief under Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202.  Plaintiff seeks a declaration that Defendant has no basis to terminate the Consumer Products License Agreement (the "Agreement"), and a preliminary and permanent injunction preventing Defendant from interfering with the Agreement.

A 24-year-old business, FTC is a small designer and manufacturer of collectible toys and action figures.  FTC has been a licensee of WWE for over 12 years.  In 2000, FTC initiated the licensing relationship between the parties when it approached WWE with the idea of selling wrestling belts that replicated the belts worn by WWE superstars.  The parties' current licensing arrangement is memorialized in the Agreement and the two amendments thereto.  Under the terms of the Agreement, FTC manufactured the licensed products, including the replica belts, in China and sold them to WWE, as well as to other customers and retailers.  The manufacture and sale of these products constitutes 90% of FTC's business.

Earlier this year, WWE hired a new Buyer, Ms. June Jack, who was placed in charge of managing the Agreement.  Ms. Jack previously worked for a U.S. toy company and had experience working directly with Chinese toy manufacturers.  Ms. Jack frequently mentioned to FTC that WWE could reap additional profits if it worked directly with the Chinese manufacturers rather than paying FTC under the Agreement.  As early as March 2013, unbeknownst to FTC and prior to any termination notice, WWE's agent contacted FTC's Chinese manufacturer about manufacturing belts directly for WWE.

On August 8, 2013 and with no prior warning, WWE sent an alleged termination notice ("Termination Notice") to FTC.  The Termination Notice alleged that FTC had failed to make timely deliveries of two products in the past year, and that this constituted reason for immediate termination under Section L(1)(a) of the Agreement.  The termination provision, however, excused late deliveries that were (1) the result of unexpected and unplanned demand, and (2) where FTC made all reasonable efforts to deliver these products at the time requested.  Because the alleged delays were the result of unexpected demand for the two products made by the WWE for which FTC had not been able to plan, and because FTC made all reasonable efforts to deliver the products on time, all the while communicating with WWE as to the reason for the delays, termination under the stated provision is improper.

After sending the Termination Notice, WWE began contacting FTC's customers and telling them to remove FTC's advertisements from their publications.  Agents of WWE have also contacted FTC's manufacturer for the products licensed under the agreement, in China, and have met with FTC's Chinese manufacturer of the products.  These actions undermine the Agreement and cause irreparable harm to FTC's business and goodwill.  FTC seeks a preliminary injunction ordering WWE to continue treating the Agreement as in effect, and barring WWE from interfering with the terms of the Agreement.  The sale of Licensed Products under the Agreement constitutes 90% of FTC's business.  Thus, if WWE is not immediately enjoined from treating the contract as terminated, FTC will be unable to sustain the loss of revenue and will collapse.

## II.      STATEMENT OF FACTS

### A.      The Parties and The Agreement

1.      FTC is a small designer and manufacturer of collectible toys and action figures. FTC has been a licensee of WWE for over 12 years.  (Declaration of Stephen Sandberg ("Sandberg Decl.") ¶ 4.)  In 2000, FTC initiated the licensing relationship between the parties

when it approached WWE with the idea of selling wrestling belts that replicated the belts worn by WWE superstars.  (*Id.*)  Based on the vision, hard work and skill of FTC, the replica belt quickly became the best-selling item in the WWE licensing program.  (*Id.*)  Over the years, the WWE has made millions of dollars from products manufactured under the Agreement. (*Id.*)  FTC was WWE's licensee for 12 years and before the deliveries identified in the Termination Notice, there was never any dispute under the Agreement.  (*Id.*)

2.     FTC spends hundreds of thousands of dollars every year on research and development in connection with the selection, creation, development and advertising of the Licensed Products.  (Sandberg Decl. ¶ 5.)  In 2013 alone, FTC, with the knowledge and full approval of WWE, has spent in excess of $150,000 on tooling to produce a second generation of more than ten different replica belts.  (*Id.*)  Over the years, the relationship between the parties has expanded such that today the Agreement encompasses many dozens of different types of products − products that are largely selected, designed and created by FTC.  (*Id.*)  Each year, thousands of deliveries of licensed products are made, and many millions of dollars of licensed products are sold.  (*Id.*)  WWE is approximately 90% of FTC's business today.  (*Id.*)

3.     The current licensing Agreement between the parties is attached as Exhibit 1 to the Declaration of Stephen Sandberg.  The Agreement provides a license to FTC to manufacture, distribute, advertise, and sell, among other things, replica belts incorporating WWE's intellectual property (the "Licensed Products").  (*See id.* at p. 4.)  Under the Agreement, FTC has the exclusive right to manufacture, distribute, and sell the replica belts in the United States in all channels of trade except for those specifically reserved to the WWE.  (*Id.* at pp. 2-3.)

4.     In 2010, FTC and WWE signed the First Amendment to Consumer Product License Agreement ("First Amendment"), which required WWE to purchase certain replica belts

3

exclusively from FTC for the term of the Agreement.  (Sandberg Decl. ¶ 7 & Ex. 2 thereto.)  In

2012, FTC and WWE signed the Second Amendment to Consumer Product License Agreement

("Second Amendment"), which extended the term of the Agreement until June 30, 2015  (Ex. 3

to Sandberg Decl.). (Sandberg Decl. ¶ 8 & Ex. 3 thereto.)

     5.     The Agreement contains the following clause relating to termination:

> ¶ L(1)(a):  <u>Immediate Right of Termination</u>.  In addition to the termination rights
> stated elsewhere in this Agreement, WWE will have the right to terminate this
> Agreement immediately by giving written notice to Licensee, in any of the
> following situations: . . . (vii) [i]f Licensee exhibits a pattern of repeated failure to
> make timely delivery of sufficient quantities of the Licensed Products to its
> customers or retailers that results: (1) in the inability of retailers to meet consumer
> demand and materially affects the generation of royalties payable to WWE, and/or
> (2) in an adverse effect to the WWE licensing program; provided, however, that
> this clause will not be applicable to a failure to make timely delivery that results
> from a force majeure event or an unexpected, unplanned demand, so long as all
> reasonable efforts are made by Licensee to resume timely delivery as soon as
> possible[.]

(Ex. 1 to Sandberg Decl. at p. 29).

     6.     FTC is WWE's largest and biggest advertiser of any licensee, spending in excess

of a hundred thousand dollars a year on advertising.  (Sandberg Decl. ¶ 9.)  FTC pays WWE at

least $130,000 a year in guaranteed royalties, and frequently exceeds that amount.  FTC has

never missed any payments.  (*Id.*)

**B.**    **Facts Giving Rise to Plaintiff's Claims**

     7.     Earlier this year, WWE hired a new Buyer, Ms. June Jack, who was placed in

charge of the Agreement between the parties.  (Sandberg Decl. ¶ 10.)  During the spring and

early summer, Ms. Jack and FTC's Mr. Sandberg communicated about products delivered under

the Agreement.  (*Id.*)  Ms. Jack repeatedly communicated to Mr. Sandberg that she was unhappy

with the Agreement because she believed that the WWE could obtain licensed products directly

4

from a Chinese manufacturer at a lower price than WWE was paying FTC for the products under the Agreement.  (*Id.*)

8.     In March 2013, shortly after Ms. Jack (whose Linkedin page states that she specializes in "global sourcing") arrived at WWE, and in violation of the Agreement, WWE's agent, the Taiwan Trading Company, surreptitiously contacted FTC's Chinese manufacturer. (*See* Declaration of John Lampl at ¶¶ 4-6 & Ex. A thereto.)  WWE's agent stated that he was working with WWE, provided FTC's Chinese manufacturer with the manufacturing drawings of the championship belt, and asked FTC's Chinese manufacturer to manufacture the product.  (*Id.*) Shortly thereafter, WWE's agent sent an actual replica belt that FTC's Chinese manufacturer had recently manufactured and asked if FTC's Chinese manufacturer would manufacture the belt. FTC's Chinese manufacturer refused to do so.  (*Id.*)

9.     On August 8, 2013, with no prior warning of a possibility of termination, WWE sent an alleged termination notice ("Termination Notice") to FTC   (Sandberg ¶ 11 & Ex. 4 thereto.).  The notice stated that WWE was immediately terminating the Agreement pursuant to Section L(1)(a) on account of an alleged "documented pattern of failures by [FTC] to make timely delivery of sufficient quantities of the Licensed Products [] at least since September 2012."  (*Id.* at p. 1). WWE contended that these alleged failures have "had an adverse effect on the WWE licensing program."  (*Id.* at p. 3).

10.     The Termination Notice identifies certain deliveries beginning with an order placed by WWE in September 2012 as grounds for the purported termination  (*See id.*).  Despite the fact that approximately 50 different products are manufactured under the Agreement, the Termination Notice identifies alleged problems with only 2 of the 50, i.e., the "spinner" belt and

the championship belt.  (*See id.*)  As shown below, none of the alleged deliveries are a proper ground for termination.

### C.   Spinner Belts

11.    In the Termination Notice, WWE contended that it placed orders for the "spinner" belt in September 2012 and November 2012, but that FTC did not timely deliver the belt.  (Ex. 4 to Sandberg Decl. at p. 2).  But that contention is incorrect.

12.    In 2012, WWE informed FTC that the spinner belts would no longer be shown on television beginning in August 2012, and were being replaced by another belt, i.e., the championship belt which is discussed *infra*.[1]  (Sandberg Decl. ¶ 12.)  Accordingly, FTC immediately focused its efforts on preparing to manufacture the championship belt – a six month long process, which requires the creation of tooling, and the sourcing of various components of the new belt.  (*Id.*)  In the 12 previous years when WWE stopped showing a belt on television, sales of the belt dramatically declined.  (*Id.*)  Based on WWE's representation and FTC's 12 year experience, FTC allowed inventory on the spinner belt to be drawn down and focused its efforts on manufacturing the championship belt.  (*Id.*)

13.    In September 2012 – a month after the date the belt was no longer to be featured on television – and with no advanced warning, WWE placed an order for 100 pieces of the spinner belt, which were to be sold at various venues throughout the United States.  (Sandberg Decl. ¶ 13.)  Upon receiving the order, FTC's Mr. Sandberg immediately informed WWE that it would be difficult to deliver the belts because WWE had told FTC that the belt would no longer be shown on television in August and FTC had thus allowed the inventory to be drawn down on

---

[1]       The replica belts at issue here, i.e., the spinner belt and the championship belt, are handmade and extremely intricate – the spinner belt requires the placement by hand of more than 2000 jewels, and the championship belt requires the placement by hand of more than 500 jewels.  Because of the detailed nature of these products, they require substantial lead time to manufacture.  (Sandberg Decl. ¶ 12.)

that item.  (*Id.*)  WWE responded that it understood the predicament in which it had placed FTC and told Mr. Sandberg to deliver the belts as soon as it could.  FTC delivered 50 pieces of the belt in December 2012 and the remaining 50 pieces on or about January 3, 2013.  (*Id.*)

14.     On or about November 14, 2012, FTC's Mr. Sandberg alerted WWE to the fact that it had not placed an order for the Christmas 2012 season. (Sandberg Decl. ¶ 14.) Later that day, and in response to FTC's reminder, WWE placed its 2012 Christmas order, which consisted of many different licensed products, including 100 pieces of the spinner belt.  (*Id.*)  Despite the fact that WWE's Christmas order was over a month late, with the exception of the spinner belt, FTC shipped every item that was ordered the same day.  (*Id.*)  With regard to the spinner belt, FTC's Mr. Sandberg again alerted WWE to the fact that WWE had told FTC that the spinner belt would be discontinued from television in August 2012 and that it would deliver the spinner belt as soon as possible.  (*Id.*)  By December 17, 2012, FTC fully delivered the 100 pieces of the spinner belt.  At its own expense, FTC arranged for these belts to be flown to WWE.  (*Id.*)

15.     WWE's September and November 2012 orders for the spinner belt were unexpected and unplanned and FTC repeatedly communicated that fact to WWE.  (Sandberg Decl. ¶ 14.)  WWE never disputed the substance of those communications until its August 8, 2013 Termination Notice. (*Id.*)  FTC used all reasonable efforts to have the spinner belts that WWE ordered in September and November 2012 manufactured and delivered, and – to the extent that the deliveries were untimely – made all reasonable efforts to resume timely deliveries of those belts immediately.  (*Id.*)  Indeed, WWE placed additional orders for the spinner belts this year beginning in early January 2013, and each of those orders were fulfilled immediately and without any claim that they were untimely. (*Id.*)  There was no negative impact on WWE's

licensing program from the timing of these two deliveries – representing one product out of the approximately 50 licensed products that are the subject of the Agreement. (*Id.*)

**D.    Championship Belts**

16.    WWE also contends in its Termination Notice that FTC failed to make timely delivery of sufficient quantities of the championship belt, beginning in March 2013, which is a ground for termination. (*See* Ex. 4 to Sandberg Decl. at pp. 1-2.) There is no merit to that contention.

17.    On or about July 31, 2012, WWE sent FTC a scanned image of the new championship belt that they wanted FTC to replicate and manufacture. (Sandberg Decl. ¶ 16.) The new championship belt was extremely intricate and would, like the spinner belt, involve the hand placement of hundreds of jewels. (*Id.*) Preparing for the manufacturing of a new replica belt as intricate as the championship belt involves at least a six month lead time. (*Id.*) Among other things, FTC must have the tooling pieces manufactured, and source the various components of the belt. (*Id.*) FTC instructed it Chinese manufacturer to manufacture as many of the championship belts as was possible. (*Id.*) In late January 2013, WWE placed its first orders for the championship belt. (*Id.*) FTC delivered on those orders in a timely manner – less than one week later – and WWE has never alleged otherwise. (*Id.*)

18.    WWE's initial orders of the championship belt constituted all of the belts that FTC's Chinese manufacturer had manufactured at that time. (Sandberg Decl. ¶ 17.) Starting in late January or early February, FTC's Chinese manufacturer closed its doors for Chinese New Year, which essentially lasts one month. (*Id.*) Thus, FTC was unable to replenish its inventory of the championship belt. (*Id.*)

19.    The championship belt retails for over $400. (Sandberg Decl. ¶ 18.) For several years prior to 2013, with the economy faltering, the demand for a toy at that price point was soft.

8

(*Id.*)  Starting with the championship belt, and an improving economy in 2013, the demand for the product was unexpectedly high and far outstripped the demand in prior years.  (*Id.*)  The demand was completely unexpected and unplanned.  (*Id.*)

20.     On or about February 26, 2013, with no advance warning, WWE placed orders for the new championship belt that were approximately 3 times greater (in excess of 1000 pieces) than the previous largest order that had been placed for a belt.  (Sandberg Decl. ¶ 19.)  At the time those orders were placed, FTC notified WWE that this unexpected, unplanned demand for the championship belt would place tremendous pressure on FTC, but that it would use its best efforts to deliver the products.  (*Id.*)  FTC delivered these products on or about March 21, 2013. Because of the unprecedented magnitude of the order, there were some quality issues with the belts that were delivered in March 2013.  (*Id.*)  However, FTC used its best efforts to acclimate to handling this unprecedented volume of orders for a handmade piece that required the placement by hand of more than 100 different jewels.  (*Id.*)

21.     On or about April 24, 2013, WWE placed another extremely large order for the championship belts, followed by smaller orders in June and July, 2013.  (Sandberg Decl. ¶ 20.) FTC once again used its best efforts to ensure the timely delivery of these belts.  (*Id.*)  In May 2013, Ms. Jack determined that each of FTC's championship belts would be examined for quality, which was a new procedure.  (*Id.*)  Based on subjective determinations made by WWE staff – applying alleged standards of "defectiveness" never provided to FTC and never applied in the past – WWE rejected some of the belts that were delivered in May and June 2013.  (*Id.*)

22.     By August 2013, FTC had completely resolved any issues relating to WWE's unexpected, unplanned demand for the championship belt and, to the extent that the championship belts had previously been delivered in an untimely manner, FTC had resumed

timely delivery.  (Sandberg Decl. ¶ 21.)  FTC had resolved all quality issues, even under the new quality standards that were being applied by WWE for the first time in May and June 2012.  (*Id.*)

23.     On August 7, 2013, Mr. Sandberg called WWE's Ms. Jack to inquire about the championship belts that had been delivered earlier in August.  (Sandberg Decl. ¶ 22.)  Ms. Jack informed Mr. Sandberg that 164 of the 165 belts were acceptable and that additional orders would be forthcoming.  (*Id.*)  At no point during that call did Ms. Jack mention any of the allegedly ongoing issues cited in the Termination Notice.  (*Id.*)

24.     On August 8, 2013, WWE purported to terminate the Agreement based on the above-identified deliveries of the spinner belts and the championship belts. (*See* Sandberg Decl. ¶ 23 & Ex. 4 thereto.).  Prior to sending the Termination Notice, WWE never notified FTC that it was poised to terminate the Agreement, or mentioned termination.  (*Id.*)  Prior to sending the Termination Notice, WWE never notified FTC that it believed the events identified above were a "pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products."  (*See* Sandberg Decl. ¶ 23 Ex. 4 to Sandberg Decl. at p. 1, referencing Section L(1)a)vii) of the Agreement).  Nor did WWE make FTC aware that the delays, if any, "had an adverse effect on the WWE licensing program."  (*See* Sandberg Decl. ¶ 23 & Ex. 4 at p. 3).

25.     After sending the Termination Notice, WWE began notifying FTC's customers that they could not advertise FTC's WWE products in their magazines.  (Sandberg Decl. ¶ 24.)  FTC's customers have begun to remove FTC's advertisements from publications.  (*Id.*)

### E.     The Effects of Termination on Plaintiff's Business

26.     FTC has been a licensee of WWE for 12 years, and produces approximately 50 different kinds of products under the Agreement.  (Sandberg Decl. ¶ 25.)  As demand for Licensed Products grew over the years, FTC devoted more of its business resources to producing and selling WWE's Licensed Products.  (*Id.*)  Indeed, at this time, **the manufacture and sale of**

**licensed products under the Agreement constitutes fully 90% of FTC's business.**  (*Id.*)  In March 2013, WWE provided FTC with projections for orders of substantial quantities of licensed products through the end of the year.  (*Id.* at ¶ 25.)  FTC long ago commenced the expensive and labor-intensive process of manufacturing those products.  (*Id.*)

27.     In 2013 alone, FTC, with the knowledge and full approval of WWE, has spent in excess of $150,000 on tooling to produce a second generation of more than ten different replica belts.  (Sandberg Decl. ¶ 26.)  Furthermore, in mid-July 2013, WWE placed the largest order that it had placed for Licensed Products in the 12 year history of the license.  (*Id.*)  FTC shipped hundreds of thousands of dollars' worth of products immediately and immediately went to work on arranging the manufacturing for other products.  (*Id.*)  No mention was made by WWE at the time that anything was wrong.  (*Id.*)  FTC has invested over 1.2 million dollars in products that are currently being manufactured.  (*Id.*)

28.     In May 2013, FTC informed WWE that it would employ a second factory to start manufacturing the championship belts to satisfy the unexpected, unplanned demand for the product.  (Sandberg Decl. ¶ 27.)  FTC spent substantial time and effort in bringing that factory online and in July 2013, Ms. Jack approved the championship belt that was manufactured by FTC's second factory.  (*Id.*)

29.     If a declaratory judgment does not issue that WWE's termination was improper, FTC – a small toymaker that has been in business for 24 years – will collapse.  (Sandberg Decl. ¶ 28.)  Because manufacture and sale of WWE licensed products comprise 90% of FTC's business, FTC will be unable to sustain a loss of this revenue source even temporarily, and will be forced to shut its doors, terminate its employees and default on various other contracts.  (*Id.*)  FTC has substantial amounts of licensed product being manufactured pursuant to WWE's orders and will

be forced to default on the contracts with its manufacturers for those goods if a declaratory judgment does not issue that the Agreement is in full force and effect.  (*Id.*)  FTC will have to sell off hundreds of thousands of dollars of tooling at a massive discount to try to meet outstanding obligations.  (*Id.*)  FTC's customers will know that FTC has gone out of business. (*Id.*)  If a declaratory judgment does not issue that the Agreement is in full force and effect, no amount of monetary damages, awarded at the end of the dispute, would make FTC whole because FTC's business would not survive the pendency of the dispute.  (*Id.*)

30.    To this day, WWE is advertising and selling the championship belt that FTC provided and is still selling the many dozens of other licensed products from FTC.  (Sandberg Decl. ¶ 29.)  No items are listed as backordered on WWE's web site.  (*Id.*)

## III.    LEGAL STANDARD

Plaintiff is entitled to a preliminary injunction to preserve the status quo if it can show: "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (citing *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009)).  Preliminary injunctive relief may be granted to a plaintiff seeking declaratory relief.  *See Rell v. Rumsfeld*, 389 F. Supp. 2d 395, 400-401 (D. Conn. 2005) (internal citation omitted) (granting a preliminary injunction to plaintiffs that brought a claim for declaratory relief); *Tri-County Wholesale Distrib., Inc. v. The Wine Group, Inc.,* 2010 US Dist. LEXIS 92598 (S.D. Ohio, Sept. 2, 2010) (same).

IV.     **LEGAL ARGUMENT**

A.      **Plaintiff is Likely to Win on the Merits of its Claims**

To establish likelihood of success on the merits, FTC must show that the Agreement was improperly terminated, and thus is rightfully still in effect.  *See Kayser-Roth Corp. v. Fruit of the Loom, Inc.*, 219 U.S.P.Q. (BNA) 736, (S.D.N.Y. Apr. 20, 1983) (where licensor terminated agreement on inadequate grounds, the court granted declaratory judgment to licensee that the agreement "remains in full force and effect"); *Solman Distrib., Inc. v. Brown-Forman Corp.*, 888 F.2d 170 (1st Cir. 1989) (affirming grant of declaratory judgment to licensee because no good cause for termination of the license); *Tri-County Wholesale Distrib.,* 2010 US Dist. LEXIS 92598 (granting preliminary injunction to licensee preventing improper termination of license).   As shown below, FTC is likely to prove that WWE had no proper basis for purported termination of the Agreement, and thus the Agreement must "remain in full force and effect."  *See Kayser-Roth*, 1983 U.S. Dist. LEXIS 17567 at *63.

1.     **Plaintiff is Likely to Prove That the Agreement was Improperly Terminated**

The bases for immediate termination alleged by WWE in the Termination Notice do not constitute proper grounds under ¶ L)1)a) of the Agreement.  That paragraph states:

¶ L(1)(a): <u>Immediate Right of Termination</u>.  In addition to the termination rights stated elsewhere in this Agreement, WWE will have the right to terminate this Agreement immediately by giving written notice to Licensee, in any of the following situations: . . . (vii) [i]f Licensee exhibits a pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products to its customers or retailers that results: (1) in the inability of retailers to meet consumer demand and materially affects the generation of royalties payable to WWE, **and/or (2) in an adverse effect to the WWE licensing program; provided, however, that this clause will not be applicable to a failure to make timely delivery that results from a force majeure event or an unexpected, unplanned demand, so long as all reasonable efforts are made by Licensee to resume timely delivery as soon as possible**[.]

13

(Ex. 1 to Sandberg Decl. at p. 29 (emphasis added)).   WWE's Termination Notice stated that WWE was immediately terminating the Agreement pursuant to Section L(1)(a) on account of an alleged "documented pattern of failures by [FTC] to make timely delivery of sufficient quantities of the Licensed Products [] at least since September 2012  (Ex. 4 to Sandberg Decl. at p. 1).   As explained below the delays in shipping these products were caused by an "unexpected, unplanned demand" by WWE for two of the approximately 50 products manufactured under the license agreement.  This "unexpected, unplanned" demand by WWE provided a convenient excuse for WWE to attempt to terminate an agreement that it was actively working to undermine as early as March.

### a.        Spinner Belts

In the case of the spinner belts, WWE informed FTC that the spinner belts would no longer be shown on television beginning in August 2012.  (Statement of Facts ("SOF") ¶ 12.)  In the twelve previous years when WWE stopped showing a belt on television, FTC's sales of that belt dramatically declined.  (*Id.*)  Based on WWE's representation and FTC's experience with waning demand for products no longer shown on television, FTC allowed inventory on the spinner belt to be drawn down and instead focuses its efforts on manufacturing the championship belt.  (*Id.*)

A month after the date the belt was no longer to be featured on television – and with no advanced warning,–WWE placed an order for 100 spinner belts, which were to be sold at various venues throughout the United States. (*Id.* at ¶ 13.)  Upon receiving the order, FTC's Mr. Sandberg immediately informed WWE that it would be difficult to deliver the belts because FTC had allowed the inventory to be drawn down due to WWE's representation that the belt would no longer be featured on television.  Furthermore, both the spinner belt and the championship belt are handmade and extremely intricate, the spinner belt requires the placement by hand of more

than 2000 jewels, and the championship belt requires the placement by hand of more than 500 jewels.  (*Id.* at n.1.)  Because of the detailed nature of these products, they require substantial lead time to manufacture.  (*Id.*)  WWE responded that it understood the predicament in which it had placed FTC and told Mr. Sandberg to deliver the belts as soon as it could.  (*Id.* at ¶ 13.)  FTC delivered 50 pieces in December 2012 and the remaining 50 pieces on or about January 3, 2013. (*Id.*)

On or about November 14, 2012, FTC's Mr. Sandberg alerted WWE to the fact that it had not placed an order for the Christmas 2012 season.  (SOF ¶ 14.)  Later that day, and in response to FTC's reminder, WWE placed its 2012 Christmas order, which consisted of many different licensed products, including 100 pieces of the spinner belt.  (*Id.*)  Despite the fact that WWE's Christmas order was over a month late, with the exception of the spinner belt, FTC shipped every item that was ordered the same day.  (*Id.*)  With regard to the spinner belt, FTC's Mr. Sandberg again alerted WWE to the fact that WWE had told FTC that the spinner belt would be discontinued from television in August 2012 and that it would deliver the spinner belt as soon as possible.  (*Id.*)  By December 17, 2012, FTC fully delivered the 100 pieces of the spinner belt. At its own expense, FTC arranged for these belts to be flown to WWE.  (*Id.*)

WWE's September and November 2012 orders for the spinner belt were unexpected and unplanned by FTC and FTC repeatedly communicated that fact to WWE.  (*Id.* at ¶ 15.)  WWE never disputed the substance of those communications until its August 8, 2013 Termination Notice. FTC used all reasonable efforts to have the spinner belts that WWE ordered in September and November 2012 manufactured and delivered, and – to the extent that the deliveries were untimely – made all reasonable efforts to resume timely deliveries of those belts immediately. (*Id.*)  Indeed, WWE placed additional orders for the spinner belts this year beginning in early

January 2013, and each of those orders were fulfilled immediately and without any claim that they were untimely. (*Id.*) There was no negative impact on WWE's licensing program from the timing of these two deliveries – representing one product out of the approximately 50 licensed products that are the subject of the Agreement. (*Id.*)

### b.   Championship Belts

WWE also contends in its Termination Notice that FTC failed to timely deliver sufficient quantities of the championship belt, beginning in March 2013, which is a ground for termination. (SOF ¶ 16.) March 2013 also happens to be the time when WWE's agent contacted FTC's Chinese manufacturer about making this championship belt. (*Id.* at ¶ 8.)

On or about July 31, 2012, WWE sent FTC a scanned image of the new championship belt that it wanted FTC to replicate and manufacture. (SOF ¶ 17.) The new championship belt was extremely intricate and would, like the spinner belt, involve the hand placement of hundreds of jewels. (*Id.*) Preparing for the manufacturing of a new replica belt as intricate as the championship belt involves at least a six- month lead time. (*Id.*) Among other things, FTC had to have the tooling pieces manufactured, and source the various components of the belt. (*Id.*) FTC instructed its Chinese manufacturer to manufacture as many of the championship belts as was possible. (*Id.*) In late January 2013, WWE placed its first orders for the championship belt. FTC delivered on those orders in a timely manner – less than one week later -- and WWE has never alleged otherwise. (*Id.*)

WWE's initial orders of the championship belt constituted all of the belts that FTC's Chinese manufacturer had manufactured at that time. (SOF ¶ 18.) Starting in late January or early February, FTC's Chinese manufacturer closed its doors for Chinese New Year, which essentially lasts one month. (*Id.*) Thus, FTC was unable to replenish its inventory of the championship belt. (*Id.*)

On or about February 26, 2013, with no advance warning, WWE placed orders for the new championship belt that were approximately 3 times greater (in excess of 1000 pieces) than the previous largest order that had been placed for a belt.  (SOF ¶ 20.)  The championship belt retails for over $400.  (*Id.* at ¶ 19.)  For several years prior to 2013, with the economy faltering, the demand for a toy at that price point was soft.  (*Id.*)  Starting with the championship belt, and an improving economy in 2013, the demand for the product was unexpectedly high and far outstripped the demand in prior years.  (*Id.*)  The demand was completely unexpected and unplanned.  (*Id.*)  At the time that WWE placed these orders, FTC notified WWE that this unexpected, unplanned demand for the championship belt would place tremendous pressure on FTC, but that it would use its best efforts to deliver the products.  (*Id.* at ¶ 20.)  FTC delivered these products on or about March 21, 2013.  (*Id.*)  Because of the unprecedented magnitude of the order, there were some quality issues with the belts that were delivered in March 2013.  (*Id.*)  However, FTC used its best efforts to accommodate this unprecedented volume of orders for a handmade piece that required the placement by hand of more than 100 different jewels.  (*Id.*)

Also in March 2013 – around the same time that WWE placed the unexpectedly large order with FTC – WWE's agent the Taiwan Trading Company first contacted FTC's Chinese manufacturer about manufacturing the championship belt directly for WWE.  (SOF ¶ 8.)  Shortly thereafter, WWE's agent sent an actual replica belt that FTC's Chinese manufacturer had recently manufactured and asked if FTC's Chinese manufacturer would manufacture the belt.  (*Id.*)  FTC's Chinese manufacturer refused to do so.  (*Id.*)

On or about April 24, 2013, WWE placed another extremely large order for the championship belts, followed by smaller orders in June and July, 2013.  (SOF ¶ 21.)  FTC once again used its best efforts to ensure the timely delivery of these belts.  (*Id.*)  In May 2013, Ms.

17

Jack determined that each of FTC's championship belts would be examined for quality, which was a new procedure.  (*Id.*)  Based on subjective determinations made by WWE staff – applying alleged standards of "defectiveness" never provided to FTC and never applied in the past – WWE rejected some of the belts that were delivered in May and June 2013.  (*Id.*)

By August 2013, FTC had completely resolved any issues relating to WWE's unexpected, unplanned demand for the championship belt and, to the extent that the championship belts had previously been delivered in an untimely manner, FTC had resumed timely delivery.  (SOF ¶ 22.) FTC had resolved all quality issues, even under the new quality standards that were being applied by WWE for the first time in May and June 2012.  (*Id.*)

On August 7, 2013, Mr. Sandberg called WWE's Ms. Jack to inquire about the championship belts that had been delivered earlier in August.  (SOF ¶ 23.)  Ms. Jack informed Mr. Sandberg that 164 of the 165 belts were acceptable and that additional orders would be forthcoming.  (*Id.*)  At no point during that call did Ms. Jack mention any of the allegedly ongoing issues cited in the Termination Notice.  (*Id.*)

On August 8, 2013, WWE purported to terminate the Agreement based on the above-identified deliveries of the spinner belts and the championship belts.  (See SOF ¶ 24; Ex. 4 to Sandberg Decl.)  Prior to sending the Termination Notice, WWE never notified FTC that it was poised to terminate the Agreement, or mentioned termination.  (SOF ¶ 24.)  Prior to sending the Termination Notice, WWE never notified FTC that it believed the events identified above were a "pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products."  (*See* SOF ¶ 24; Ex. 4 to Sandberg Decl. at p. 1, referencing Section L(1)a)vii) of the Agreement).  Nor did WWE make FTC aware that the delays, if any, "had an adverse effect on the WWE licensing program."  (*See* SOF ¶ 24; Ex. 4 to Sandberg Decl. at p. 3)

After sending the Termination Notice, WWE began notifying FTC's customers that they could not advertise FTC's WWE products in their magazines.  (SOF ¶ 25.)  FTC's customers have begun to remove FTC's advertisements from publications.  (*Id.*)

In both situations cited by WWE as grounds for immediate termination, any delay on the part of FTC in delivering the products were the result of an "unexpected, unplanned demand." (*see* Ex. 1 to Sandberg Decl. at p. 29).  Furthermore, in both cases FTC made "all reasonable efforts [] to resume timely delivery as soon as possible."  (*See id.*).  The existence of these factors bars termination under Section L)1)a) of the Agreement.  (*Id.*)  In addition, WWE has not explained what, if any, effect the alleged late deliveries had on the WWE licensing program  (*See id.*).  Thus, FTC is likely to prove that the termination of the Agreement was improper, and that the allegations of late deliveries put forth by WWE were merely pretexts to allow WWE to renege on the Agreement so that it could increase its profits by producing the Licensed Products itself.[2]  *See, e.g.*, *Eastman Kodak Co. v. Collins Ink Corp.*, 821 F. Supp. 2d 582, 583 (W.D.N.Y. 2011) (issuing preliminary injunction requiring defendant to continue supplying plaintiff with ink, where defendant's reasons for terminating were not permitted by the termination clause of the contract); *Tri-County Wholesale Distrib.*, 2010 US Dist. LEXIS 92598 (in a declaratory judgment action by licensee/distributor of alcoholic products, the court issued a preliminary injunction barring termination of plaintiffs as distributors, and barring defendants from entering into any competing contracts in the same area) (*aff'd*, 2012 U.S. App. LEXIS 13415 (6th Cir.

---

[2] In addition, Section L(1)(a) has no application in this situation because it only gives rise to a termination, upon "a pattern of repeated failure [by FTC] to make timely delivery of sufficient quantities of Licensed Products **to its customers or retailers** . . ." (emphasis added).  (Ex. 1 to Sandberg Decl. at p. 29.)  Because the only failures identified by WWE in its Termination Notice are with respect to deliveries made to WWE, and WWE is not a "customer or retailer," Section L(1)a)(vii) has no application and is not a proper basis on which to terminate the Agreement. FTC has not failed to make timely delivery of sufficient quantities of Licensed Products to any of its customers or retailers.

June 29, 2012)).  *See also Solman Distrib.*, 888 F.2d 170 (affirming District Court of Maine's grant of declaratory judgment to licensee, and holding that distribution agreement was not terminated where the licensor failed to provide good cause for the termination); *Kayser-Roth*, 219 U.S.P.Q. (BNA) 736, 1983 U.S. Dist. LEXIS 17567 at *63 (licensee obtained declaratory judgment that license agreement was not terminated, where licensor attempted to terminate the agreement based on invocation of a contract provision that had not previously been strictly enforced, and where licensor applied that provision without sufficient notice to licensee).

> **2.    The Balance of Hardships Weighs in Plaintiff's Favor**

Even if the Court disagrees that FTC has shown that it is likely to win on the merits, the facts described *supra* in Section A.1. at the very least pose "sufficiently serious questions going to the merits to make them a fair ground for litigation."  *Biediger*, 616 F. Supp. 2d at 291.  In addition, as explained below, the balance of hardships weighs in FTC's favor, thus providing an alternate ground for granting the preliminary injunction.  *See Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (where distributor risked losing his entire business if the contract with licensor was terminated, the court granted preliminary injunction, finding that because "the equities tip (rather heavily) in favor of granting a preliminary injunction, [the distributor] need demonstrate only 'serious questions going to the merits'").

FTC seeks a preliminary injunction to preserve the status quo: specifically, that the Agreement is still in effect, that FTC may continue to manufacture and sell the Licensed Products, and that WWE may not interfere with the Agreement.  If FTC's request is not granted and the Agreement is deemed terminated, FTC will suffer significant harm, including the loss of its entire business.  (*See* SOF ¶¶ 26-30.)

Production of WWE's Licensed Products constitutes **90% of FTC's business**, and thus is far and away its main source of profits.  (SOF ¶ 26.)  If FTC is not permitted to continue making and selling these products, it will lose 90% of its income, causing it to have to lay off employees, default on other licenses and contracts, and collapse.  (*Id.* at ¶ 29.) *See, e.g.*, *RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285, 301 (E.D.N.Y. 2006) ("It is well settled in this Circuit 'that the loss of a business' constitutes irreparable harm."); *Roso-Lino*, 749 F.2d at 126 (equities tip in favor of granting preliminary injunction where one party is likely to lose its business as a result of the loss of the license).

Furthermore, in mid-July 2013, WWE placed the largest order that it had placed for Licensed Products in the 12 year history of the license.  (SOF ¶ 26.)  FTC shipped hundreds of thousands of dollars' worth of products immediately and immediately went to work on arranging the manufacturing for other products.  FTC has invested over 1.2 million dollars in products that are currently being manufactured.  (SOF ¶ 26.)  In 2013 alone, FTC, with the knowledge and full approval of WWE, has spent in excess of $150,000 on tooling to produce a second generation of more than ten different replica belts.  (*Id.* at ¶ 27.)  Further, in May 2013, FTC informed WWE that it would employ a second factory to start manufacturing the championship belts to satisfy the unexpected, unplanned demand for the product.  (*Id.* at ¶ 28.)  FTC spent substantial time and effort in bringing that factory online and in July 2013, Ms. Jack approved the championship belt that was manufactured by FTC's second factory.  (*Id.*)  As a result of its efforts to timely fill WWE's orders, FTC has substantial amounts of Licensed Products currently being manufactured, and has invested $1.2 million dollars in products that are currently being manufactured.  If FTC is not allowed to sell these products it will be forced to default on the contracts with its manufacturers for those goods if a declaratory judgment does not issue that the Agreement is in

21

full force and effect.  (*Id.* at ¶¶ 26, 29.)  FTC will have to sell off hundreds of thousands of dollars of tooling at a massive discount to try to meet outstanding obligations.  (*Id.* at ¶ 29.) FTC's customers will know that FTC has gone out of business, and the goodwill that FTC has created through 12 years of selling the Licensed Products will be destroyed, making it impossible for FTC to ever again sell products under the Agreement.(*Id.*)  *See Tri-County Wholesale Distrib.,* 2010 US Dist. LEXIS 92598, at \*20 (where licensee had been distributing licensor's products for many years, loss of the license was likely to cause irreparable damage to its goodwill).

WWE, in contrast, is unlikely to suffer much harm from being ordered to continue complying with the contract that it willingly signed a year and a half ago.  FTC has resolved any manufacturing issues that existed with regard to the brand new championship belts ordered by WWE, and has begun manufacturing the products that WWE has projected as recently as March and July 2013.  (SOF ¶¶ 22, 26.)  Indeed, WWE's July 2013 order for millions of dollars of products predated the Termination Notice by less than a month; surely if WWE was so concerned about FTC's timeliness and quality, it would not have placed this order.  To this day, WWE is advertising and selling the championship belt that FTC provided and is still selling the many dozens of other licensed products from FTC.  (*Id.* at ¶ 30.)  No items are listed as backordered on WWE's web site.  (*Id.*)  Furthermore, FTC is WWE's largest and biggest advertiser of any licensee, spending in excess of a hundred thousand dollars a year on advertising.  (*Id.* at ¶ 6.) FTC pays WWE at least $130,000 a year in guaranteed royalties, and frequently exceeds that amount.  (*Id.*)  In 12 years FTC has never missed any payments.  (*Id.*)  Thus, WWE will not suffer any loss of business or damage to its licensing program from an order maintaining the

status quo, since it will continue to enjoy the benefits of receiving and profiting from the Licensed Products it has ordered from FTC. *See Roso-Lino*, 749 F.2d at 126.

**B.      Plaintiff Will Suffer Irreparable Harm in the Absence of an Injunction**

FTC will suffer irreparable harm if WWE is not preliminarily enjoined from undermining the Agreement.  "It is well settled in this Circuit 'that the loss of a business constitutes irreparable harm.**"** *RxUSA Wholesale, Inc. v. HHS*, 467 F. Supp. 2d 285, 301 (E.D.N.Y. 2006) (citing *Soap Opera Now, Inc. v. News America Pub., Inc.*, No. 90-CV-2631, 1990 WL 124335 at *4 (S.D.N.Y. Aug. 17, 1990); *Roso-Lino*, 749 F.2d at 125-26.  "Where the injunction will prevent damage to the business as a whole, irreparable harm can be established." *RxUSA Wholesale*, 467 F. Supp. 2d at 301.

WWE deliberately engaged in deceptive conduct in the days leading up to the termination so that it could put FTC – it's long time business partner – in the worst position possible to respond to a bogus termination.  In mid-July, it placed the largest order it had ever placed in the 12 year history of the license with no advance warning.  Once it had wiped out FTC's inventory, caused FTC to spend over a million in beginning to replenish that inventory to satisfy more orders, and led FTC to believe that everything was fine between the parties, it terminated the agreement out of the blue.  Faced with a termination, WWE believed that it could then pick up the massive amounts of products that FTC was having made at cost. This is precisely what Ms. Jack, specialist in "global sourcing," had in mind in March 2013, when WWE's agent attempted to have the replica belts manufactured directly by FTC's manufacturer in blatant violation of the Agreement.  WWE should not be rewarded for this sort of behavior.

Thanks to WWE's manipulative actions and unjustified termination, FTC faces irreparable harm, including the complete loss of its business.  If WWE is not preliminarily enjoined from terminating the Agreement, FTC – a small toymaker that has been in business for

24 years – will collapse.  (SOF ¶ 29.)  Because manufacture and sale of WWE licensed products comprise **90% of FTC's business**, FTC will be unable to sustain a loss of this revenue source even temporarily, and will be forced to shut its doors, terminate its employees and default on its other contracts.  (*Id.*)  FTC has substantial amounts of licensed product being manufactured pursuant to WWE's orders and will be forced to default on the contracts with its manufacturers for those goods.  (*Id.*)  It will have to sell off hundreds of thousands of dollars of tooling at a massive discount to try to meet outstanding obligations.   FTC's customers who regularly purchase the Licensed Products will know that FTC has gone out of business, and FTC will lose the goodwill it his built up in the sale of the Licensed Products.  (*Id.*)  FTC will lose its investment in equipment it acquired to manufacture the Licensed Products – in 2013 alone, FTC, with the knowledge and full approval of WWE, spent in excess of $150,000 on tooling to produce a second generation of more than ten different replica belts.  (*Id.* at ¶ 27.)  If FTC cannot sell these products, as well as fill other orders for Licensed Products under the Agreement, FTC will lose 90% of its income – a prospect that is unsustainable for a small toy company.  (*See id.* at ¶ 29.)  Indeed, if WWE is not preliminarily enjoined from denying FTC the benefits of the Agreement, it is unlikely that it will survive the litigation and be able to benefit from any monetary damages awarded at its conclusion.  (*See id.*)  *See, e.g., Roso-Lino*, 749 F.2d at 126 (reversing trial court and granting preliminary injunction to distributor who alleged that defendant Coca-Cola had improperly terminated the contract  ("It is unlikely that Coca-Cola  will suffer greatly if the eleven-year relationship is continued for a short while. . . . The two owners of Roso-Lino, on the other hand, stand to lose their business forever.")); *Tri-County Wholesale Distrib.,* 2010 US Dist. LEXIS 92598 at *20 (licensee showed irreparable harm where the licensor's products comprised a significant portion of licensee's sales, and licensee had promoted

and distributed the licensor's products for decades, thus building up substantial goodwill in connection with these products).

In contrast, WWE will not suffer any irreparable harm from being required to continue performing the terms of the contract that it willingly signed. *See Roso-Lino*, 749 F.2d at 126. FTC is in process of preparing Licensed Products for WWE in response to WWE's sizable projections of March 2013, and large order of July 2013. (SOF ¶¶ 26-28.) Thus, WWE will have the products it needs to conduct its business and will not suffer any harm from being ordered to abide by the Agreement that it signed as recently as a year and a half ago. To this day, WWE is advertising and selling the championship belt that FTC provided and is still selling the many dozens of other licensed products from FTC. (*Id.* at ¶ 30.) No items are listed as backordered on WWE's web site. (*Id.*) To the extent WWE claims that it will be damaged by having to pay higher prices for products than it could attain by directly contracting with FTC's manufacturer, this is simply a result of the bargain WWE struck when it voluntarily signed the Second Amendment in 2012. Any alleged damage WWE would incur would be compensable by monetary damages. *See Marshak v. Thomas*, No. CV-98-2550, 1998 U.S. Dist. LEXIS 23644, at *40 (E.D.N.Y. June 11, 1998) (Granting preliminary injunction where "defendant has not shown any hardship that could not be compensated by money damages.").

## V.    NO BOND OR A NOMINAL BOND IS APPROPRIATE

The Second Circuit has stated that "the District Court is vested with wide discretion in the matter of security," and that it may be "proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). This is such a case. As explained *supra*, WWE is unlikely to suffer harm as a result of the preliminary injunction. First, FTC is likely to win on the merits. *See supra* p. 11-13. *See, e.g., New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 345 (S.D.N.Y.

2010) (declining to require a bond where plaintiff was likely to win on the merits).  Second, even if FTC is not ultimately successful on the merits, WWE will suffer no harm from having to "continue to perform under the contract, as it has been doing for years." *Eastman Kodak*, 821 F. Supp. 2d at 590 (declining to require a bond upon issuance of preliminary injunction); *Blom ASA v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010) ("Since the injunction does no more than preserve the preexisting status quo, in which the parties were engaged in an ongoing contractual relationship (which presumably was mutually beneficial to them), there is little risk of significant harm to either side.)").

If the Court believes that a bond is required, an amount not exceeding $32, 500 – the quarterly amount of minimum payment required under the Second Amendment – is sufficient (*See* Ex. 3 to Sandberg Decl.).  *See Golden Krust Patties, Inc. v. Bullock*, 13-CV-2241, 2013 U.S. Dist. LEXIS 99184 (E.D.N.Y. July 16, 2013) (require plaintiffs to post a $20,000 bond, representing almost three months of payments under the lease);  *N. Am. Olive Oil Assoc. v. Kangadis Food Inc.*, No. 13 Civ. 868, 2013 U.S. Dist. LEXIS 59557, 2013 WL 1777774, at *8 (S.D.N.Y. Apr. 25, 2013) ($10,000 security was appropriate, where non-movant's suggestion of $10 million bond was "wildly unreasonable," but court could not "conclude that [non-movant] would be totally unharmed by th[e] injunction.").

## VI.   CONCLUSION

For the reasons above, FTC respectfully prays that this Court issue a preliminary injunction, in the form submitted, ordering WWE to treat the Agreement as effective and to cease taking steps to undermine the Agreement.

McDERMOTT WILL & EMERY LLP

August 31, 2013
Respectfully Submitted,

THE PLAINTIFF
FIGURES TOY COMPANY

BY:          /S/ (ct06645)
MARK R. CARTA,
Carta, McAlister & Moore, LLC
1120 Post Road, Post Office Box 83
Darien, Connecticut 06820
(203) 202-3100 – Mark@CMM-Law.com

John J. Dabney (to file for admission *pro hac vice*)
Katie Bukrinsky (to file for admission *pro hac vice*)
Mary Hallerman (to file for admission *pro hac vice*)
McDermott Will & Emery LLP
500 North Capitol St, NW
Washington, DC 20001
(202) 756-8000 (telephone)
(202) 756-8087 (facsimile)

Attorneys for Plaintiffs