IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FIGURES TOY COMPANY, a Florida Corporation<br><br>    Plaintiff,<br><br>    v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC., a Delaware Corporation<br><br>    Defendant. | Civil Action No. 3:13-cv-01256<br><br>JURY TRIAL DEMANDED |

**DECLARATION OF STEPHEN SANDBERG IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Stephen Sandberg, hereby declare, affirm and state the following:

    1.    I am more than twenty-one years of age and am otherwise competent to make the following statements.

    2.    I am the co-owner of Plaintiff Figures Toy Company ("FTC"). I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I can and will testify to these facts in a court of law.

    3.    I make this declaration in support of Plaintiff's Motion for Preliminary Injunction.

    4.    FTC is a small designer and manufacturer of collectible toys and action figures. FTC has been a licensee of World Wrestling Entertainment, Inc. ("WWE") for over 12 years. In 2000, FTC initiated the licensing relationship between the parties when it approached WWE with the idea of selling wrestling belts that replicated the belts worn by WWE superstars. Based on the vision, hard work and skill of my company, the replica belt quickly became the best-selling item in the WWE licensing program. Over the years, the WWE has made millions of dollars from products manufactured under the Agreement. Before the deliveries identified in the Termination Notice, there was never any dispute under the Agreement.

5.      FTC spends hundreds of thousands of dollars every year on research and development in connection with the selection, creation, development and advertising of the Licensed Products.  In 2013 alone, FTC, with the knowledge and full approval of WWE, has spent in excess of $150,000 on tooling to produce a second generation of more than ten different replica belts.  Over the years, the relationship between the parties has expanded such that today the Agreement encompasses many dozens of different types of products – products that are largely selected, designed and created by FTC.  Each year, thousands of deliveries of licensed products are made, and many millions of dollars of licensed products are sold.  WWE is approximately 90% of FTC's business today.

6.      A true and correct copy of the current licensing Agreement ("Agreement") between the parties is attached as <u>Exhibit 1</u> to my Declaration.

7.      A true and correct copy of the First Amendment to Consumer Product License Agreement ("First Amendment"), which required WWE to purchase certain replica belts exclusively from FTC for the term of the Agreement, is attached as <u>Exhibit 2</u> to my Declaration.

8.      A true and correct copy of the Second Amendment to Consumer Product License Agreement ("Second Amendment"), which extended the term of the Agreement until June 30, 2015, is attached as <u>Exhibit 3</u> to my Declaration.

9.      FTC is WWE's largest and biggest advertiser of any licensee, spending in excess of a hundred thousand dollars a year on advertising.  FTC pays WWE at least $130,000 a year in guaranteed royalties, and frequently exceeds that amount.  FTC has never missed any payments.

10.     Earlier this year, WWE hired a new Buyer, Ms. June Jack, who was placed in charge of the Agreement between the parties.  During the spring and early summer, I communicated with Ms. Jack about products delivered under the Agreement.  Ms. Jack

repeatedly communicated to me that she was unhappy with the Agreement because she believed that the WWE could obtain licensed products directly from a Chinese manufacturer at a lower price than WWE was paying FTC for the products under the Agreement.

11. On August 8, 2013, with no prior warning of a possibility of termination, I received a notice from WWE claiming to terminate the Agreement. A true and correct copy of the notice is attached as <u>Exhibit 4</u> to my Declaration.

12. In 2012, WWE informed FTC that the products known as "spinner belts" would no longer be shown on television beginning in August 2012, and were being replaced by another belt – the championship belt. Both the spinner belt and the championship belt, are handmade and extremely intricate – the spinner belt requires the placement by hand of more than 2000 jewels, and the championship belt requires the placement by hand of more than 500 jewels. Because of the detailed nature of these products, they require substantial lead time to manufacture. Accordingly, FTC immediately focused its efforts on preparing to manufacture the championship belt – a six month long process, which requires the creation of tooling, and the sourcing of various components of the new belt. In the 12 previous years when WWE stopped showing a belt on television, sales of the belt dramatically declined. Based on WWE's representation and FTC's 12 year experience, FTC allowed inventory on the spinner belt to be drawn down and focused its efforts on manufacturing the championship belt.

13. In September 2012 – a month after the date the belt was no longer to be featured on television – and with no advanced warning, WWE placed an order for 100 pieces of the spinner belt, which were to be sold at various venues throughout the United States. Upon receiving the order, I immediately informed WWE that it would be difficult to deliver the belts because WWE had told FTC that the belt would no longer be shown on television in August and

FTC had thus allowed the inventory to be drawn down on that item. WWE responded that it understood the predicament in which it had placed FTC and told me to deliver the belts as soon as it could. FTC delivered 50 pieces of the belt in December 2012 and the remaining 50 pieces on or about January 3, 2013.

14.     On or about November 14, 2012, I alerted WWE to the fact that it had not placed an order for the Christmas 2012 season. Later that day, and in response to FTC's reminder, WWE placed its 2012 Christmas order, which consisted of many different licensed products, including 100 pieces of the spinner belt. Despite the fact that WWE's Christmas order was over a month late, with the exception of the spinner belt, FTC shipped every item that was ordered the same day. With regard to the spinner belt, I again alerted WWE to the fact that WWE had told FTC that the spinner belt would be discontinued from television in August 2012 and that it would deliver the spinner belt as soon as possible. By December 17, 2012, FTC fully delivered the 100 pieces of the spinner belt. At its own expense, FTC arranged for these belts to be flown to WWE.

15.     WWE's September and November 2012 orders for the spinner belt were unexpected and unplanned and FTC repeatedly communicated that fact to WWE. WWE never disputed the substance of those communications until its August 8, 2013 Termination Notice. FTC used all reasonable efforts to have the spinner belts that WWE ordered in September and November 2012 manufactured and delivered, and – to the extent that the deliveries were untimely -- made all reasonable efforts to resume timely deliveries of those belts immediately. Indeed, WWE placed additional orders for the spinner belts this year beginning in early January 2013, and each of those orders were fulfilled immediately and without any claim that they were untimely. There was no negative impact on WWE's licensing program from the timing of these

two deliveries – representing one product out of the approximately 50 licensed products that are the subject of the Agreement.

16. On or about July 31, 2012, WWE sent FTC a scanned image of the new championship belt that they wanted FTC to replicate and manufacture. The new championship belt was extremely intricate and would, like the spinner belt, involve the hand placement of hundreds of jewels. Preparing for the manufacturing of a new replica belt as intricate as the championship belt involves at least a six month lead time. Among other things, FTC must have the tooling pieces manufactured, and source the various components of the belt. FTC instructed it Chinese manufacturer to manufacture as many of the championship belts as was possible. In late January 2013, WWE placed its first orders for the championship belt. FTC delivered on those orders in a timely manner – less than one week later – and WWE has never alleged otherwise.

17. WWE's initial orders of the championship belt constituted all of the belts that FTC's Chinese manufacturer had manufactured at that time. Starting in late January or early February, FTC's Chinese manufacturer closed its doors for Chinese New Year, which essentially lasts one month. Thus, FTC was unable to replenish its inventory of the championship belt.

18. The championship belt retails for over $400. For several years prior to 2013, with the economy faltering, the demand for a toy at that price point was soft. Starting with the championship belt, and an improving economy in 2013, the demand for the product was unexpectedly high and far outstripped the demand in prior years. The demand was completely unexpected and unplanned.

19. On or about February 26, 2013, with no advance warning, WWE placed orders for the new championship belt that were approximately 3 times greater (in excess of 1000 pieces)

than the previous largest order that had been placed for a belt. At the time those orders were placed, FTC notified WWE that this unexpected, unplanned demand for the championship belt would place tremendous pressure on FTC, but that it would use its best efforts to deliver the products. FTC delivered these products on or about March 21, 2013. Because of the unprecedented magnitude of the order, there were some quality issues with the belts that were delivered in March 2013. However, FTC used its best efforts to acclimate to handling this unprecedented volume of orders for a handmade piece that required the placement by hand of more than 500 different jewels.

20.     On or about April 24, 2013, WWE placed another extremely large order for the championship belts, followed by smaller orders in June and July, 2013. FTC once again used its best efforts to ensure the timely delivery of these belts. In May 2013, Ms. Jack determined that each of FTC's championship belts would be examined for quality, which was a new procedure. Based on subjective determinations made by WWE staff – applying alleged standards of "defectiveness" never provided to FTC and never applied in the past – WWE rejected some of the belts that were delivered in May and June 2013.

21.     By August 2013, FTC had completely resolved any issues relating to WWE's unexpected, unplanned demand for the championship belt and, to the extent that the championship belts had previously been delivered in an untimely manner, FTC had resumed timely delivery. FTC had resolved all quality issues, even under the new quality standards that were being applied by WWE for the first time in May and June 2012.

22.     On August 7, 2013, I called WWE's Ms. Jack to inquire about the championship belts that had been delivered earlier in August. Ms. Jack informed me that 164 of the 165 belts

were acceptable and that additional orders would be forthcoming.  At no point during that call did Ms. Jack mention any of the allegedly ongoing issues cited in the Termination Notice.

23. On August 8, 2013, WWE purported to terminate the Agreement based on the above-identified deliveries of the spinner belts and the championship belts.  Prior to sending the Termination Notice, WWE never notified FTC that it was poised to terminate the Agreement, or mentioned termination.  Prior to sending the Termination Notice, WWE never notified FTC that it believed the events identified above were a "pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products."   Nor did WWE make FTC aware that the delays, if any, "had an adverse effect on the WWE licensing program."

24. After sending the Termination Notice, WWE began notifying FTC's customers that they could not advertise FTC's WWE products in their magazines.  FTC's customers have begun to remove FTC's advertisements from publications.

25. FTC has been a licensee of WWE for 12 years, and produces approximately 50 different kinds of products under the Agreement.  As demand for Licensed Products grew over the years, FTC devoted more of its business resources to producing and selling WWE's Licensed Products.  At this time, the manufacture and sale of licensed products under the Agreement constitutes fully 90% of FTC's business.  In March 2013, WWE provided FTC with projections for orders of substantial quantities of licensed products through the end of the year.  FTC long ago commenced the expensive and labor-intensive process of manufacturing those products.

26.  In 2013 alone, FTC, with the knowledge and full approval of WWE, has spent in excess of $150,000 on tooling to produce a second generation of more than ten different replica belts.  Furthermore, in mid-July 2013, WWE placed the largest order that it had placed for Licensed Products in the 12 year history of the license.  We shipped hundreds of thousands of

dollars' worth of products immediately and immediately went to work on arranging the manufacturing for other products.  No mention was made by WWE at the time that anything was wrong.  We have invested over 1.2 million dollars in products that are currently being manufactured.

27.     In May 2013, FTC informed WWE that it would employ a second factory to start manufacturing the championship belts to satisfy the unexpected, unplanned demand for the product.  FTC spent substantial time and effort in bringing that factory online and in July 2013, Ms. Jack approved the championship belt that was manufactured by FTC's second factory.

28.     If a declaratory judgment does not issue that WWE's termination was improper, FTC – a small toymaker that has been in business for 24 years – will collapse.  Because manufacture and sale of WWE licensed products comprise 90% of our business, we will be unable to sustain a loss of this revenue source even temporarily, and will be forced to shut its doors, terminate our employees and default on various other contracts.  FTC has substantial amounts of licensed product being manufactured pursuant to WWE's orders and will be forced to default on the contracts with its manufacturers for those goods if a declaratory judgment does not issue that the Agreement is in full force and effect.  FTC will have to sell off hundreds of thousands of dollars of tooling at a massive discount to try to meet outstanding obligations. FTC's customers will know that FTC has gone out of business and the goodwill that we have built with our customers will be destroyed.  FTC will not be able to survive the pendency of the dispute if it is not permitted to continue producing and selling products under the Agreement.

29. To this day, WWE is advertising and selling the championship belt that FTC provided and is still selling the many dozens of other licensed products from FTC. No items are listed as backordered on WWE's web site.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on August 30, 2013

Stephen Sandberg